JENNIFER A. SORENSON (SBN: 268665)
Natural Resources Defense Council
  111 Sutter Street, 21st Floor
  San Francisco, CA 94104
  Telephone: (415) 875-6164
  Fax: (415) 795-4799
  E-mail: jsorenson@nrdc.org
*Counsel for Plaintiff Natural Resources Defense Council*

XAVIER BECERRA
Attorney General of California
SUSAN S. FIERING
Supervising Deputy Attorney General
JAMIE JEFFERSON (SBN: 197142)
SOMERSET PERRY (SBN: 293316)
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0280
  Fax: (510) 622-2270
  E-mail: Jamie.Jefferson@doj.ca.gov
*Attorneys for the People of the State of California,*
*by and through Attorney General Xavier Becerra*

[Additional counsel for plaintiffs listed on signature page]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; SIERRA CLUB; CONSUMER FEDERATION OF AMERICA; and TEXAS RATEPAYERS' ORGANIZATION TO SAVE ENERGY,<br><br>              Plaintiffs,<br><br>    v.<br><br>RICK PERRY, in his official capacity as Secretary of the United States Department of Energy; and the UNITED STATES DEPARTMENT OF ENERGY,<br><br>              Defendants,<br><br>    and<br><br>AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE,<br><br>              Defendant-Intervenor. | **Lead Case**<br><br>Case No. 17-cv-03404-VC<br><br>**CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case<br><br>(Energy Policy and Conservation Act, 42 U.S.C. § 6291 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; Federal Register Act, 44 U.S.C. § 1501 *et seq.*) |

THE PEOPLE OF THE STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA, THE CALIFORNIA ENERGY COMMISSION, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, BY AND THROUGH ITS MINNESOTA DEPARTMENT OF COMMERCE AND MINNESOTA POLLUTION CONTROL AGENCY, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF VERMONT, STATE OF WASHINGTON, THE DISTRICT OF COLUMBIA, and CITY OF NEW YORK,

          Plaintiffs,

  v.

JAMES R. PERRY, AS SECRETARY OF UNITED STATES DEPARTMENT OF ENERGY, and THE UNITED STATES DEPARTMENT OF ENERGY,

          Defendants,

  and

AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE,

         Defendant-Intervenor.

*Consolidated with*

Case No. 17-cv-03406-VC

**INTRODUCTION**

1.      This lawsuit challenges the U.S. Department of Energy's (DOE's) unlawful failure to publish in the Federal Register four final rules (the Final Rules) developed under the Energy Policy and Conservation Act (EPCA). The four rules establish cost-effective, technologically justified, consumer-friendly, and environmentally beneficial energy-conservation standards for several categories of home appliances and commercial and industrial equipment: portable air conditioners, uninterruptible power supplies, air compressors, and commercial packaged boilers. Plaintiffs are the People of the State of California, by and through Attorney General Xavier Becerra, California's State Energy Resources Conservation and Development Commission (California Energy Commission or CEC), the States of New York, Connecticut, Illinois, Maine, Maryland, Minnesota, by and through its Minnesota Department of Commerce and Minnesota Pollution Control Agency, Oregon, Vermont, and Washington, the Commonwealths of Massachusetts and Pennsylvania, the District of Columbia, and the City of New York (collectively, the Government Plaintiffs), and the Natural Resources Defense Council (NRDC), the Sierra Club, the Consumer Federation of America (CFA), and the Texas Ratepayers' Organization to Save Energy (Texas ROSE) (collectively, the Citizen Plaintiffs).

2.      EPCA prescribes energy-conservation standards for a variety of consumer, commercial, and industrial equipment. The statute establishes initial minimum energy-conservation standards for many products, and directs DOE to meet specific timetables for periodic review and revision of those standards to ensure that they are set at the maximum efficiency level that is technologically feasible and economically justified.

3.      DOE adopted the Final Rules in December 2016. Each rule is the result of a robust rulemaking process in which the agency collected input from manufacturers, trade associations, consumer advocates, and others in public meetings and through public comments. An authorized DOE official signed and dated each rule, and the agency posted the Final Rules on its website for a 45-day error-correction period, pursuant to the agency's error-correction regulation.

4.      DOE's error-correction regulation allows the public to alert the agency to a minor error in a final energy-conservation rule—such as a "typographical," "calculation," or "numbering"

error—before the rule is published. The regulation mandates that, following the 45-day period for public review, DOE must submit the final rule to the Office of the Federal Register for publication. If DOE deems any corrections necessary, the agency has 30 days, absent extenuating circumstances, to submit a corrected rule for publication.

5.      The last of the public-review periods for the Final Rules ended on February 11, 2017. As far as plaintiffs are aware, DOE received no correction requests for the portable air conditioners rule, the uninterruptible power supplies rule, or the air compressors rule. DOE received three correction requests purporting to identify errors in the commercial packaged boilers rule.

6.      DOE has not submitted any of the Final Rules to the Office of the Federal Register for publication.

7.      DOE's failure to submit the Final Rules for publication violates the agency's error-correction regulation under EPCA. In the alternative, DOE's failure to publish the rules violates the Administrative Procedure Act and the Federal Register Act.

8.      In addition, the uninterruptible power supplies rule is subject to a statutory deadline that DOE has missed. DOE's failure to publish this rule by the deadline prescribed by Congress violates EPCA.

9.      DOE's unlawful failure to publish these four final energy-conservation rules deprives plaintiffs, their constituents, their members, and the American public of the substantial benefits the rules would bring, including lower energy bills, a more reliable electricity grid, and reduced emissions of harmful air pollutants that threaten public health. DOE estimates that the Final Rules, as applied to products purchased over a thirty-year period, will save 1.86 quadrillion BTUs (or "quads") of energy, reduce carbon dioxide emissions by 98.8 million metric tons, and result in net savings of up to nearly $8.5 billion.

10.      Plaintiffs seek an order enjoining DOE to ensure immediate publication of the Final Rules in the Federal Register.

## JURISDICTION

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 6305(a)(2)-(3) and 6316, and 5 U.S.C. § 702.

12.     DOE's failure to submit the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule for publication in the Federal Register is a failure to perform a nondiscretionary duty under DOE's regulations implementing EPCA, 10 C.F.R. § 430.5, and is subject to judicial review, 42 U.S.C. §§ 6305(a)(2), 6316.

13.     To the extent notice is required with respect to any of the claims herein, *id.* § 6305(b)(2), notice of this action was provided to DOE by California, New York, Connecticut, Illinois, Maine, Maryland, Massachusetts, Oregon, Pennsylvania, Vermont, Washington, the City of New York, NRDC, the Sierra Club, and CFA by certified mail dated April 3, 2017, with a copy to the Federal Trade Commission. *See* Exhibits A and B. The District provided notice to DOE by certified mail dated April 19, 2017, and provided a copy of the notice to the Federal Trade Commission by certified mail dated May 23, 2017. Texas ROSE, the CEC, and Minnesota, by and through its Minnesota Department of Commerce and Minnesota Pollution Control Agency, provided notice to DOE by certified mail dated May 10, 2017, June 1, 2017, and June 5, 2017, respectively, with a copy to the Federal Trade Commission.

14.     In the alternative, DOE's failure to publish the Final Rules in the Federal Register is an agency action unlawfully withheld or unreasonably delayed, in violation of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D), and the Federal Register Act, 44 U.S.C. §§ 1503, 1505, and is subject to judicial review, 5 U.S.C. §§ 702, 706(1).

15.     In addition, DOE's failure to publish the final energy-conservation rule for uninterruptible power supplies is a failure of Secretary of Energy Rick Perry to comply with a nondiscretionary duty to issue final rules according to the schedules set forth in 42 U.S.C. § 6295, and is subject to judicial review, *id.* § 6305(a)(3).

16.     This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 6305(a)(2)-(3), and 5 U.S.C. §§ 702 and 706.

**VENUE AND INTRADISTRICT ASSIGNMENT**

17.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C) because this civil action is brought against an agency of the United States and an

3

officer and employee of the United States acting in his official capacity and under the color of legal authority, Plaintiffs People of the State of California, by and through Attorney General Xavier Becerra, and the Sierra Club reside in this judicial district, and no real property is involved in the action.

18.     Pursuant to Local Rule 3-2(c) and (d), assignment to the San Francisco Division or the Oakland Division is appropriate because Plaintiff Sierra Club resides in Alameda County, and because the assigned attorneys representing Plaintiff People of California are based in the Attorney General's Oakland office.

**THE PARTIES**

The Plaintiffs

19.     Plaintiff the People of the State of California bring this action by and through Attorney General Xavier Becerra. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions to protect public rights and interests, including actions to protect the natural resources of the State. *See* Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

20.     Plaintiff the California Energy Commission brings this suit to protect its interest in energy conservation. The California Energy Commission is the State's primary agency for energy policy and planning and is responsible for reducing the State's electricity and natural gas demand primarily by adopting appliance and building energy efficiency standards. Cal. Pub. Res. Code §§ 25000 et seq. (the Warren-Alquist Act); Cal. Code Regs. tit. 20, §§ 1601-1609.

21.     Plaintiff State of New York is a sovereign entity and brings this action by and through Eric T. Schneiderman, Attorney General, to protect its own sovereign and proprietary rights, and as *parens patriae* on behalf of its affected citizens and residents.

22.     Plaintiff State of Washington is a sovereign entity and brings this action to protect its own sovereign and proprietary rights, and as *parens patriae* on behalf of its affected citizens and residents. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This

challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

23.     Plaintiff the People of the State of Maine bring this action by and through Attorney General Janet Mills. The Attorney General is a constitutional officer with statutory authority to file civil actions in which the State is a party, and common law authority to institute such actions as she deems necessary for the protection of public rights. Constitution of Maine, Art. IX, § 11; 5 M.R.S. §§ 191; 192 (2015); *Superintendent of Ins. v. Attorney General,* 558 A.2d 1197, 1199 (Me. 1989).

24.     Plaintiff the State of Connecticut brings this action by and through its Attorney General George Jepsen on behalf of its citizens and natural resources.

25.     Plaintiff the People of the State of Illinois bring this action by and through Attorney General Lisa Madigan. The Attorney General is the chief legal officer of the State of Illinois, Ill. Const., Art. V, § 15, and "has the prerogative of conducting legal affairs for the State." *Envtl. Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. 1977). She has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Industries*, 604 N.E. 2d 349, 358 (Ill. 1992).

26.     Plaintiff the State of Vermont brings this action by and through Vermont Attorney General Thomas J. Donovan, Jr. The Attorney General is the State of Vermont's chief legal counsel and is vested with broad authority and powers to protect the State's citizens. Vt. Stat. Ann. tit. 3, § 152 (Attorney General "may represent the state in all civil and criminal matters as at common law and as allowed by statute"). The Attorney General appears for Vermont in all cases in which Vermont is a party, or when the interests of Vermont so require; and has "general supervision of matters and actions" for Vermont. *Id*. §§ 157, 159. This action is brought pursuant to the Attorney General's authority to protect the interests of Vermont.

27.     Plaintiff the State of Oregon is a sovereign entity and brings this action to protect its sovereign and proprietary rights. The Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court when requested by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to

5

protect the interests of the state. ORS 180.160(1)(d). The Oregon Department of Energy, established as a state agency by the Oregon Legislature pursuant to ORS Chapter 469, has requested that the Attorney General bring this suit to protect Oregon's sovereign and proprietary interest in energy conservation.

28.     Plaintiff the State of Maryland is a sovereign state represented by and through Maryland Attorney General Brian Frosh. The Attorney General is the chief law enforcement officer of Maryland and has the authority to file civil actions on behalf of Maryland and the people of Maryland in the federal courts on matters of public concern. These matters include the federal government's action or inaction that threatens the public interest and welfare of the residents of the State, including acts that harm the environment and natural resources of Maryland. 2017 Md. Laws J.R. 1; Md. Const., Art. V, § 3.

29.     Plaintiff the Commonwealth of Massachusetts brings this action by and through Massachusetts Attorney General Maura Healey. Attorney General Healey is the chief legal officer of the Commonwealth and is authorized to bring this action on behalf of the Commonwealth, on behalf of ratepayers in the Commonwealth, and, as *parens patriae*, on behalf of the residents of the Commonwealth, pursuant to her statutory authority under Mass. Gen. L. ch. 12, §§ 11D and 11E.

30.     Plaintiff the State of Minnesota, by and through its Minnesota Department of Commerce and Minnesota Pollution Control Agency, brings this suit to protect its interests in energy conservation and environmental protection. The Minnesota Department of Commerce is Minnesota's lead agency for the implementation of the State's energy efficiency resource standard, which it implements through its Conservation Improvement Program. The Minnesota Department of Commerce has jurisdiction over energy policy implementation to promote energy efficiency and energy conservation. Minn. Stat. § 216B.2401. The Minnesota Pollution Control Agency is Minnesota's lead agency for enforcing environmental regulations and is responsible for reducing the amount of pollution that is emitted in the State. Minn. Stat. § 116.07.

31.     Plaintiff the Commonwealth of Pennsylvania brings this action by and through Attorney General Josh Shapiro, "the chief law officer of the Commonwealth," to protect its own sovereign and proprietary rights and, separately, as *parens patriae* on behalf of its affected citizens

6

and residents. Pa. Const., Art. IV, sec. 4.1. Attorney General Shapiro is authorized to bring this action on behalf of the Commonwealth pursuant to his statutory authority under 71 P.S. § 732-204.

32.     Plaintiff the District of Columbia (the District) brings this action by and through its Attorney General Karl A. Racine. The District is a municipal corporation created by an act of Congress, and is the local government for the territory constituting the permanent seat of the government of the United States, and has the power to sue and be sued. The Attorney General for the District is charged with conducting all law business in the District, and is responsible for protecting both the District's interests and the public interest. D.C. Code 1-301.81(A)(1). This challenge is brought pursuant to the Attorney General's independent statutory and common law authority to represent the public interest. *Id.*

33.     Plaintiff City of New York brings this action by and through its counsel, Zachary W. Carter, Corporation Counsel of the City of New York. The City of New York is a municipal corporation organized under the laws of the State of New York. The Corporation Counsel has the right to bring actions to maintain, defend and establish the rights, interest or demands of the City or the People thereof. New York City Charter § 394(c).

34.     Collectively, Government Plaintiffs represent over 120 million people in the United States.

35.     Plaintiff NRDC is a national, nonprofit environmental and public health organization with several hundred thousand members. NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment. One of NRDC's top priorities is to fight climate change by cutting carbon emissions and building the clean energy economy. As part of this work, NRDC promotes the use of sustainable energy sources and energy efficiency to reduce greenhouse gas pollution, lower consumer energy bills, and minimize the adverse environmental impacts of electricity generation and natural gas production. NRDC has participated in the majority of DOE's rulemakings to develop efficiency standards for appliances and commercial equipment, including the rulemakings for the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule.

7

36.     Plaintiff Sierra Club is a national, nonprofit environmental organization with hundreds of thousands of members nationwide. Sierra Club's purposes include practicing and promoting the responsible use of the Earth's ecosystems and resources. Energy efficiency is crucial to achieving Sierra Club's mission, and Sierra Club has a variety of initiatives designed to encourage businesses, individuals, and utilities to undertake energy-conservation measures.

37.     Plaintiff CFA is an association of more than 250 nonprofit consumer organizations established to advance the consumer interest through research, advocacy, and education. CFA has long supported cost-effective energy-efficiency standards and DOE's efficiency standards program for consumer products.

38.     Plaintiff Texas ROSE is a Texas-based nonprofit membership organization dedicated to helping obtain affordable energy and a healthy environment for residential consumers, especially those with low incomes. Texas ROSE has hundreds of members throughout the state of Texas. Texas ROSE works on a broad range of utility and energy issues to benefit Texas consumers, especially low-income consumers, including advocacy in support of cost-effective energy-efficiency measures.

Plaintiffs' Interests

39.     The Government Plaintiffs collectively have significant proprietary and sovereign interests in increased energy efficiency and reduced energy use within their jurisdictions, in protecting their populations and environments, and in enforcing their laws designed to foster energy efficiency and reduce climate change-related impacts. Those interests and efforts are undermined by DOE's failure to publish the Final Rules in the Federal Register. The Final Rules save energy, lower energy bills, reduce air pollution emissions and related public health impacts, produce a more reliable energy grid, reduce the likelihood of electricity shortages and blackouts, and alleviate the need to build new power plants. Each of the Government Plaintiffs relies on energy efficiency regulations as a key part of its strategy to reduce climate change-related impacts and achieve its greenhouse gas reduction goals. DOE's failure to publish the efficiency standards for air compressors, commercial packaged boilers, portable air conditioners, and uninterruptible power supplies harms the Government Plaintiffs by delaying the energy efficiency benefits the Final Rules

8

achieve. In the absence of a declaratory judgment and permanent injunction requiring DOE to publish the Final Rules in the Federal Register, this delay will continue to cause the aforementioned harms to the Government Plaintiffs and is likely to continue indefinitely.

40.     California. California seeks to protect its sovereign and proprietary interests in achieving the State's objectives to reduce greenhouse gas emissions and increase energy efficiency. California law establishes targets to reduce the State's greenhouse gas emissions to 1990 levels by 2020 and to 40 percent below 1990 levels by 2030. *See* California Global Warming Solutions Act of 2006 (Assembly Bill 32, Chapter 488, September 27, 2006 and Senate Bill 32, Chapter 249, September 8, 2016); Cal. Health & Safety Code § 38500-38599. To achieve the 2030 target, the California legislature has directed the CEC to double energy efficiency savings in electricity and natural gas final end uses by 2030. *See* Clean Energy and Pollution Reduction Act of 2015 (Senate Bill 350, Chapter 547, October 7, 2015), Cal. Pub. Res. Code § 25310; *see also* Cal. Pub. Res. Code § 25402 (mandating that the CEC reduce the wasteful, uneconomic, inefficient, or unnecessary consumption of energy through the adoption of building and appliance energy efficiency standards). In addition to the State's climate-related laws that prioritize energy efficiency for reducing greenhouse gas emissions, energy efficiency is a key component to helping California manage an aging energy infrastructure and meeting the State's growing electricity needs. *See* California Energy Commission, 2016 Integrated Energy Policy Report Update, at pp. 7-8, http://docketpublic. energy.ca.gov/PublicDocuments/16-IEPR-01/TN216281_20170228T131538_Final_2016_ Integrated_Energy_Policy_Report_Update_Complete_Repo.pdf; *see also* California Energy Commission, 2007 Integrated Energy Policy Report, at p. 3, http://www.energy.ca.gov/ 2007publications/CEC-100-2007-008/CEC-100-2007-008-CMF.PDF (describing California's "loading order," which mandates using energy efficiency and demand response before new power plants to meet the State's growing energy demand). Energy efficiency standards have helped keep California's per capita electricity consumption relatively flat when compared to states without efficiency standards. DOE's failure to publish the Final Rules frustrates California's efforts to reach its energy efficiency and greenhouse gas reduction goals.

41.     New York. Among the interests that New York seeks to protect are its sovereign and proprietary interests in maintaining a clean, resilient, and affordable energy system for itself and its citizens. N.Y. Energy Law § 3-101. New York's 2015 State Energy Plan identifies several key clean energy goals for the year 2030, which include a 40 percent reduction in greenhouse gas emissions from 1990 levels, increasing the percentage of total energy produced from renewable energy sources to 50 percent, and a 600 trillion British thermal unit increase in state-wide energy efficiency gains. N.Y. Pub. Serv. Comm'n, Case 15-E-0302, Order (August 1, 2016). In order to achieve these goals, New York has adopted a Clean Energy Standard outlining regulatory programs and policies to facilitate the transition to more sustainable energy sources and aggressively pursue energy efficiency. *Id*. The Clean Energy Standard builds upon New York's earlier efforts to boost efficiency, such as the state's implementation of its Energy Efficiency Portfolio Standard, which sought to reduce total electricity consumption in the state 15 percent by 2015. N.Y. Pub. Serv. Comm'n, Case 07-M-0548, Energy Efficiency Portfolio Standard, Order (June 23, 2008). DOE's failure to timely promulgate energy efficiency standards is inconsistent with and undermines these efforts by New York State.

42.     Washington. The State of Washington requires its large electric utilities (serving approximately 90 percent of the state's entire electricity load) to identify and capture all cost effective electricity efficiency improvements in their service territories. Energy Independence Act – Wash. Rev. Code § 19.285. The Washington State Legislature has directed Washington to "pursue all cost effective energy efficiency and conservation as the state preferred energy resource." Wash. Rev. Code § 43.21F.088(1)(a). Appliance efficiency standards are an integral component of cost effective conservation, with the appliance standards currently on the books expected to reduce total Northwest regional consumption by as much as five percent by 2035. NW Power and Conservation Council, 7th Power Plan. In addition, as part of the adoption of Washington State's appliance efficiency standards, the state Legislature found that "efficiency standards save energy and reduce pollution and other environmental impacts associated with the production, distribution, and use of electricity and natural gas." Wash. Rev. Code § 19.260.010. DOE's unlawful delay in promulgating

10

energy efficiency standards is inconsistent with these interests and impedes these efforts by the State of Washington.

43.    Maine. Maine seeks to protect its sovereign and proprietary interest in achieving a clean and affordable energy system for itself and its citizens. The Maine Legislature has declared that air pollution and acid deposition present a severe threat to Maine's natural resources, public health, and economy. 38 M.R.S. § 581 (2015); 38 § M.R.S. 603-B (2015). Reducing electrical consumption nationally will assist in reducing air pollution from utilities to the south and west whose emissions significantly impact Maine. On top of this threat, Maine has above average energy costs and an industrial sector that consumes more than 30 percent of the State's electricity. Governor's Energy Office, Maine Comprehensive Energy Plan Update ("Maine Energy Plan"), 18-19 (Feb. 2016). The high cost of energy is viewed as the single greatest challenge to growing Maine's economy. Id. at 19. In an effort to lower energy costs and reduce pollution, Maine's clean energy goals include reducing greenhouse gas emissions to 10 percent below 1990 levels by 2020 (38 M.R.S. § 576 (2)(2015)), investing in energy efficiency programs (Maine Energy Plan, at 17-21), reducing energy consumption in state owned facilities (5 M.R.S. § 1764-A (2015)), and committing to renewable energy (Maine Energy Plan, at 45). DOE's failure to timely promulgate energy efficiency standards has negative economic and environmental consequences for Maine and undermines Maine's energy policies that rely on energy efficiency gains.

44.    Connecticut. The State of Connecticut has undertaken extensive efforts to increase energy efficiency and reduce energy consumption, efforts that are undermined by DOE's failure to timely promulgate these energy efficiency standards. Connecticut has enacted legislation supporting the conservation of energy and continues to act to protect its sovereign interests and the goals outlined in its statutorily required state comprehensive energy plan that specifically targets energy efficiency and demand reduction. Conn. Gen. Stat. §§ 16a-1, 16a-3d, 16a-35k. In addition, Connecticut has extensive programs targeting residential and commercial energy efficiency and spends up to $246 million annually to reduce energy consumption. Id. §§ 16a-46e to 46j.

45.    Illinois. Among the interests that Illinois seeks to protect is its public policy "to provide and maintain a healthful environment for the benefit of this and future generations." Ill.

Const., Art. XI, § 1. The Illinois General Assembly has found that the health, welfare, and prosperity of all Illinois citizens requires adequate, reliable, affordable, efficient, and environmentally sustainable electric service. 20 ILCS 3855/1-5. In 2016 Illinois enacted legislation to update and expand its existing renewable power and energy efficiency standards. *See* Public Act 99-0906. Illinois has established a renewable energy goal of 25 percent by 2025 and an energy efficiency goal of 21.5 percent cumulative persisting annual savings by 2030 in the state's largest utility area. 20 ILCS 3855/1-75(c)(1)(B), 220 ILCS 5/8-103B(b-5). DOE's failure to timely promulgate energy efficiency standards is inconsistent with and undermines Illinois' pursuit of a clean and efficient electric sector.

46.   <u>Vermont.</u> Among the interests that Vermont seeks to protect are its sovereign and proprietary interests in meeting renewable energy goals and maintaining an energy policy that reduces global climate change, develops viable markets for energy efficiency products, and assures "efficient use of energy resources" to the "greatest extent practicable." Vt. Stat. Ann. tit. 30, §§ 202a, 8001(a); *see also id.* §§ 209(d), 218c (providing goals and requirements for energy efficiency and conservation programs, including development of "comprehensive energy efficiency programs"). Specifically, Vermont's Department of Public Service (DPS) represents the public interest in energy and telecommunications matters. *See generally id.* § 2. Toward that end, the DPS is charged with preparing a "State Comprehensive Energy Plan" to implement the State's energy policy. *Id.* § 202b. Energy efficiency is a key component of that plan, including extensive recommendations specific to efficiency programs. 2016 State of Vermont Comprehensive Energy Plan, § 10.2 Electric Energy Efficiency, https://goo.gl/Uh48nR; *see also* Vermont Residential Building Energy Code Handbook 9-20 (2015), https://goo.gl/QkznQ8 (providing basic requirements for residential construction, including numerous efficiency measures). DPS also oversees two energy efficiency utilities that deliver efficiency services to consumers throughout Vermont. State of Vermont DPS, Efficiency (2017), https://goo.gl/r53ZS9. DOE's failure to timely publish energy efficiency standards is inconsistent with Vermont's goals and makes it more difficult to achieve energy efficiency to the greatest extent practicable.

12

47.    Oregon. The State of Oregon has numerous sovereign and proprietary programs and goals designed to increase energy efficiency. The promotion of energy conservation is a part of the Oregon Department of Energy's core mission and authority. ORS 469.010(1)(b). Oregon has adopted its own energy efficiency standards for various categories of products. ORS 469.229 - .261. Oregon also requires its large investor-owned electric utilities to identify and capture all cost-effective electric efficiency improvements in their service territories. ORS 757.600 - .689. With respect to publicly owned buildings, Oregon has set a goal of 20 percent energy use reduction in all state-owned buildings by 2023, and has established a funding mechanism to increase energy efficiency in schools. ORS 276.900 - .915; ORS 757.600 - .689. In addition, Oregon is a part of the Northwest Power and Conservation Council. In its Seventh Power Plan, the Northwest Power and Conservation Council calls for the region to pursue cost-effective energy efficiency to meet all electricity load growth through 2030. In addition to meeting the region's future electricity needs, the Council considers efficiency to be the single largest source of new peaking capacity. Northwest Power and Conservation Council Seventh Northwest Power Plan, Executive Summary (available at: https://www.nwcouncil.org/energy/powerplan/7/plan). The federal appliance efficiency standards are essential to meeting the targets of the Seventh Power Plan. *Id*. at Appendix F, p. F-3. The federal standards will also help Oregon meet its greenhouse gas emission reduction goals. 2007 Or. Laws Ch. 907. As such, Oregon is interested in ensuring that the EPCA standards at issue are duly published in accordance with DOE's non-discretionary duty.

48.    Maryland. The State of Maryland has a compelling interest in bringing this action as a means of furthering its energy efficiency, energy reduction, and environmental protection goals. Specifically, Maryland has devoted significant time and resources to increase energy efficiency and reduce energy use. Under the EmPOWER Maryland Energy Efficiency Act of 2008, for example, the State originally set a goal of achieving a 15 percent reduction in energy consumption and a 15 percent reduction in peak electricity demand by 2015. Md. Code Ann., Pub. Util. Cos. § 7-211. Recent legislation extended the program by stating that to the extent the Maryland Public Service Commission determines that cost-effective energy efficiency and conservation programs and services are available, the Commission shall require each electric company to procure or provide for

its customers cost-effective energy efficiency and conservation programs and services with projected and verifiable electricity savings that are designed on a trajectory to achieve a targeted annual incremental gross energy savings of at least 2.0 percent per year, calculated as a percentage of the electric company's 2016 weather-normalized gross retail sales and electricity losses. Maryland's Public Service Commission has six open and active dockets (PSC Case Nos. 9153, 9154, 9155, 9156, 9157, and 9362) focused on evaluating and approving utility plans and progress toward achieving the energy efficiency targets established under the Act. Maryland's Jane E. Lawton Conservation Loan Program provides low interest loans to promote energy conservation and energy efficiency in the State. Md. Code Ann., State Gov't §§ 9-20A-01 to 9-20A-10. Also, Maryland's Strategic Energy Investment Program and Fund provides financial and other assistance and incentives to promote cost-effective energy efficiency and conservation measures in the State. DOE's failure to promulgate energy efficiency standards in accordance with EPCA is inconsistent with Maryland's efforts in this regard. Additionally, the economic and environmental benefits from DOE energy efficiency standards, such as those at issue in this matter, result in utility cost savings for Maryland residents, and constitute feasible and economical ways to significantly reduce carbon dioxide and other greenhouse gas emissions. Maryland seeks to ensure that these national standards become effective as a critical component of the State's broader efforts to reduce air pollution. Greenhouse gas emissions pose a significant threat to public health and climate stability. Maryland, like other states, has enacted greenhouse gas emission limitations across various sectors of the State's economy. *See, e.g.*, Md. Code Ann., Envir., § 2–1204 (requiring Maryland to reduce statewide greenhouse gas emissions by 25 percent from 2006 levels by 2020), Md. Code Ann., Envir., §§ 2–1102 and 1103 (requiring the Maryland Department of the Environment to establish a low emissions vehicle program by adopting California's emissions standards), Md. Code Ann., Pub. Utilities § 7-703 (Maryland's renewable energy portfolio standard), Md. Code Ann., Envir., § 2–1301 (establishing the Maryland Commission on Climate Change), § 7-211 (requiring Maryland gas and electric companies to develop and implement programs and services to encourage and promote energy efficiency and conservation of energy); Md. Code Ann., Envir., § 2-1002(g). Thus, DOE's failure to promulgate energy efficiency standards in accordance with EPCA is further inconsistent

14

with Maryland's efforts to prevent and mitigate climate change harms, and to protect State citizens from other forms of dangerous air pollution.

49.    Massachusetts. The Commonwealth of Massachusetts has vital interests that are compromised by DOE's failure timely to submit for publication these Final Rules that strengthen energy efficiency standards for the subject product categories. To reduce energy costs and to protect public health (including reducing respiratory disease in vulnerable infants and young children in Massachusetts) and the climate by reducing air pollutant and greenhouse gas emissions from the electric sector, Massachusetts has implemented many laws that mandate, and secure the many benefits of, energy efficiency. Since passage of the Electricity Restructuring Act of 1997, 1997 Mass. Acts ch. 164, electric investor-owned utilities in the Commonwealth have been required to implement energy efficiency programs so that today more than 2 percent of Massachusetts' annual electricity needs are met through efficiency. *2016 State Energy Efficiency Scorecard*, American Council for an Energy-Efficient Economy (Sept. 26, 2016). In 2005, Massachusetts amended its appliance standards law, Mass. Gen. L. ch. 25B, to set more stringent efficiency standards for certain appliances and equipment. St. 2005, c. 139, An Act Establishing Minimum Energy-Efficiency Standards for Certain Products. The Green Communities Act, 2008 Mass. Acts ch. 169, mandates that Massachusetts procure "all available energy efficiency and demand reduction resources that are cost effective or less expensive than supply," Mass. Gen. L. ch. 25, § 21(b)(1), which was set at 2.93 percent of retail electric sales and 1.24 percent of retail gas sales in 2016, and increases through 2018. *Three-Year Energy Efficiency Plan for 2016 through 2018*, D.P.U. 15-160 through 15-169, p. 14 (Jan. 28, 2016). In 2008, Massachusetts also enacted the Global Warming Solutions Act, 2008 Mass. Acts ch. 298, requiring an economy-wide state greenhouse gas reduction target between 10 percent and 25 percent below 1990 levels by 2020, with a goal of an 80 percent reduction by 2050, while significantly committing the state to energy efficiency. Mass. Gen. L. ch. 21N, added by St. 2008, c. 298, § 6, eff. Nov. 5, 2008. In 2010, the Commonwealth set the 2020 target at 25 percent below statewide 1990 greenhouse gas levels. *See* Determination of Greenhouse Gas Limit for 2020 (Dec. 28, 2010), http://www.mass.gov/eea/docs/eea/energy/2020-ghg-limit-dec29-2010.pdf. And the Commonwealth has developed its Clean Energy and Climate Plan for

2020, requiring reduced fossil fuel use in buildings through, among others, the increased efficiency of equipment, including appliances. Massachusetts building codes also set high standards for energy efficiency performance. For these efforts, Massachusetts has earned for six consecutive years the number one ranking by the American Council for an Energy-Efficient Economy as the leading state in energy efficiency. DOE's failure timely to promulgate the subject energy efficiency standards for these commonly used consumer and commercial products widely available in Massachusetts is inconsistent with, and undermines, Massachusetts' multifaceted efforts to increase energy efficiency in the Commonwealth.

50.    Minnesota. The State of Minnesota has declared a greenhouse gas emissions reduction goal of 30% by 2025, and 80% by 2050. Minn. Stat. § 216H.02, subd. 1. The Minnesota legislature has found that "cost-effective energy savings are preferred over all other energy resources" and that "cost-effective energy savings should be procured systematically and aggressively in order to . . . reduce pollution and emissions that cause climate change." Minn. Stat. § 216B.2401. Furthermore, "it is the energy policy of the state of Minnesota to achieve annual energy savings equal to at least 1.5 percent of annual retail energy sales of electricity and natural gas through cost-effective energy conservation improvement programs and . . . [among other initiatives] appliance standards . . ." *Id.* Minnesota's electric and natural gas utilities spend almost $200,000,000 annually on energy efficiency efforts in order to achieve (and often surpass) the 1.5% energy savings goal. In addition to greenhouse gas reductions, the Final Rules are projected to reduce sulfur dioxide and nitrogen oxide emissions that contribute to adverse health impacts in Minnesota. DOE's failure to timely publish the Final Rules is contrary to Minnesota's greenhouse gas goals and emission reduction goals and undermines its ability to maximize energy savings and achieve the public health benefits of reducing other harmful pollutants. The consequences of DOE's failure to publish the Final Rules are significant. With continued publication delays, the projected economic, environmental, and public health benefits of the Final Rules will also be delayed, as manufacturers' compliance dates are measured from the rules' effective dates.

51.    Pennsylvania. The Pennsylvania Constitution provides that the people "have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of

the environment" and obligates the Commonwealth to "conserve and maintain" Pennsylvania's natural resources. Pa. Const. art. I, § 27. Consistent with this obligation, the Commonwealth has a special interest in energy conservation and encourages the use of energy efficient appliances and equipment. For example, the Pennsylvania Department of Environmental Protection, the Commonwealth's primary environmental agency, implements a number of energy conservation and efficiency programs under statutes such as the Energy Development Authority Law, 71 P.S. § 720.1 et seq., and the Small Business and Household Pollution Prevention Program Act, 35 P.S. § 6029.201 et seq. DOE's failure to strengthen energy efficiency standards for the product categories in violation of the EPCA undermines the Commonwealth's interest in encouraging energy conservation and efficiency and will lead to increased energy consumption and pollution in Pennsylvania, degrading the constitutional rights of Pennsylvanians "to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment."

52. <u>District of Columbia.</u> Among the interests that the District seeks to protect on behalf of itself and its citizens is the public interest in maintaining a clean and sustainable energy system. The District has in place renewable energy portfolio standards which implement increasingly aggressive targets whereby a certain percentage of energy sales must come from tier 1 renewable energy sources. For example, by 2032, District law requires that 50% of energy sales in the District be generated from renewable sources. D.C. Code § 34-1432(c)(22). The District's commitment to sustainability is well known (http://dcist.com/2015/12/dc_wins_global_award_for_renewable.php). The District recently entered into a 20-year power purchase agreement to supply 35% of the District Government's electricity needs from wind power. The District is in the process of identifying technologies and policies that can modernize its energy delivery system for increased sustainability that will make its system more reliable, efficient, cost-effective, and interactive. *See* D.C. Pub. Serv. Comm'n, Formal Case No. 1130, Order No. 17912 rel. June 12, 2015. DOE's failure to timely promulgate energy efficiency standards is inconsistent with and undermines these efforts by the District.

53. <u>City of New York.</u> Among the interests the City of New York seeks to protect is its governmental and proprietary interest in ensuring a clean, affordable, resilient, and reliable energy

system. As a low-lying coastal community with 520 miles of coastline, which has already experienced the devastating effects of climate change, the City of New York has a compelling interesting in ensuring the reduction of greenhouse gases to mitigate against climate change. The City of New York has committed to a greenhouse gas reduction goal of 80 percent by 2050 and any additional reductions needed to meet its share of the Paris Agreement reduction goals. *See* One New York: The Plan for a Strong and Just City (2015), 166-71 (outlining reductions needed from the power sector to meet this goal); City of New York Office of the Mayor Executive Order No. 26 of 2017 (directing the Mayor's Office of Sustainability and city agencies to create a citywide plan by September 30, 2017 to advance the Paris Agreement's goal of limiting global temperature increases to 1.5° Celsius above pre-industrial levels). Energy efficiency standards for appliances help the City of New York meet these important goals. Accordingly, DOE's failure to improve energy efficiency standards as required by EPCA is contrary to New York City's interests and efforts in this regard.

54.     The Government Plaintiffs also have strong proprietary interests in improving energy efficiency and ensuring that DOE complies with EPCA. For example, many of the Government Plaintiffs purchase and use the appliances for which DOE has developed updated efficiency standards. These appliances are used in state- or city-owned office buildings, warehouses, maintenance shops, hospitals, and residential care or educational facilities. The Government Plaintiffs will face increased energy costs if DOE fails to publish the Final Rules. In addition, some of the states, such as New York, provide direct financial assistance to low income households to reduce energy costs, which may be higher in the absence of efficiency standards such as DOE's new standard for portable air conditioners. Many states also pay for some or all of the medical costs of many of their residents. Increased pollution due to less efficient products can lead to negative health effects, which in turn result in increased need for medical care and higher medical costs.

55.     The Citizen Plaintiffs and their members and constituents have strong environmental, health, and consumer interests in the prompt publication of the final energy-conservation rules for portable air conditioners, uninterruptible power supplies, air compressors, and commercial packaged boilers. The Citizen Plaintiffs and their members include consumers and business owners who use, or whose businesses use, portable air conditioners, uninterruptible power supplies, and

18

commercial packaged boilers. The Final Rules will help the Citizen Plaintiffs and their members save energy and lower their energy bills; will reduce air pollution emissions from power plants and other electricity generators and the adverse health impacts from those emissions; will reduce the possibility of electric shortages and blackouts; will keep wholesale electricity prices down during periods of peak electricity demand; and will help avoid the need to build new power plants. In the absence of a court order requiring DOE to publish the Final Rules, there is no indication that the rules will be published and become effective. DOE's unlawful failure to publish the Final Rules harms the environmental, health, and consumer interests of the Citizen Plaintiffs and their members and constituents because it denies them the benefits that the energy-conservation rules would bring. The Citizen Plaintiffs' injuries will be redressed by the requested relief.

The Defendants

56.    Defendant Rick Perry, Secretary of Energy, is the head of DOE and is responsible for ensuring compliance with EPCA. Defendant Perry is sued in his official capacity.

57.    Defendant DOE is an agency of the United States Government. DOE is responsible for administering EPCA, and is the agency whose failure to act as required by law is challenged here.

## STATUTORY AND REGULATORY BACKGROUND

58.    DOE must comply with the following federal statutes, among others: EPCA, the Administrative Procedure Act, and the Federal Register Act.

Energy Policy and Conservation Act (EPCA)

59.    Energy-conservation standards are one of the most cost-effective tools available to the federal government to achieve large-scale energy conservation. Energy-conservation standards reduce the adverse environmental impacts of energy consumption, such as air, land, and water pollution associated with fossil fuel extraction and electricity generation, without compromising product performance.

60.    Congress enacted EPCA in 1975 to reduce wasteful use of the nation's energy resources following the 1973 oil embargo. *See* Pub. L. No. 94-163, 89 Stat. 871 (1975) (codified at 42 U.S.C. §§ 6291-6309). EPCA's purposes include "conserv[ing] energy supplies through energy

conservation programs" and improving the energy efficiency of major appliances. 42 U.S.C. § 6201(4), (5).

61.     Initially, EPCA authorized, but did not require, DOE to establish energy-conservation standards for household appliances, including appliances listed in the Act and other appliances designated by DOE. Congress amended EPCA in 1978, however, and mandated that DOE prescribe energy-conservation standards for thirteen classes of major appliances. *See* National Energy Conservation Policy Act, Pub. L. No. 95-619, 92 Stat. 3206. The 1978 amendments also created a program for improving the efficiency of industrial equipment, now codified at 42 U.S.C. §§ 6311-6317.

62.     In 1987, after NRDC and others successfully sued DOE for its continued failure to set meaningful energy-conservation standards for appliances, *see NRDC v. Herrington*, 768 F.2d 1355 (D.C. Cir. 1985), Congress enacted, and President Reagan signed into law, further amendments to EPCA. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103. The 1987 amendments established energy-conservation standards for household appliances such as room air conditioners, water heaters, and furnaces, and required DOE to review and amend these standards periodically, by specific deadlines. 42 U.S.C. §§ 6291-6309.

63.     Since 1987, Congress has continued to make EPCA stronger. In 1992, President George H.W. Bush signed into law amendments prescribing energy-conservation standards for commercial and industrial equipment such as packaged boilers. *See* Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776.

64.     President George W. Bush signed into law additional strengthening amendments in 2005 and 2007. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492. The 2007 amendments required DOE to set energy-conservation standards for battery chargers (which include uninterruptible power supplies), or determine that no standard was technically feasible and economically justified, by July 1, 2011. 42 U.S.C. § 6295(u)(1)(E)(i)(II).

65.     When DOE establishes or amends an energy-conservation standard under EPCA, the standard must be designed to achieve the maximum improvement in energy efficiency that is

20

technologically feasible and economically justified. *Id.* §§ 6295(o)(2)(A), 6316(a). The standard must also result in significant conservation of energy. *Id.* §§ 6295(o)(3)(B), 6316(a).

66.     DOE must review its existing standards at least every six years and either determine that the standards do not need to be amended or propose new standards. *Id.* §§ 6295(m)(1), 6313(a)(6)(C)(i). If DOE proposes new standards, then it must publish a final rule within two years of issuing a notice of proposed rulemaking. *Id.* §§ 6295(m)(3), 6313(a)(6)(C)(iii).

67.     EPCA contains an "anti-backsliding" provision, which prevents DOE from prescribing any amended standard that either increases the maximum allowable energy use or decreases the minimum required energy efficiency of a covered product. *Id.* §§ 6295(o)(1), 6313(a)(6)(B)(iii)(I).

68.     EPCA's energy-conservation standards program for appliances and equipment has been highly effective in improving our nation's energy efficiency, saving consumers money, and avoiding emissions of greenhouse gases and other air pollutants. DOE estimates that, by 2030, the standards completed through 2016 will save more energy than the entire nation consumes in one year, and will save consumers more than $2 trillion on their utility bills. Reduced energy use also avoids emissions of harmful air pollutants: through 2030, standards completed through 2016 will cut emissions of more than 7.9 billion metric tons of carbon dioxide, more greenhouse gas emissions than the entire United States generates in a year.

## DOE's Error-Correction Regulation

69.     Energy-conservation standards under EPCA are complex and technical, and it is "conceivable" that a final standard could contain an error. 81 Fed. Reg. 26,998, 26,999 (May 5, 2016). EPCA's anti-backsliding provision may limit DOE's ability to correct an error after an energy-conservation standard is published in the Federal Register, because the statute prevents DOE from making any amendments that would result in a less-stringent standard. 42 U.S.C. §§ 6295(o)(1), 6313(a)(6)(B)(iii)(I). DOE has addressed this potential problem by establishing a procedure for identifying and correcting errors in a final energy-conservation standard before the standard is published in the Federal Register. 10 C.F.R. § 430.5 (the Error Correction Regulation).

70.   At the conclusion of a rulemaking establishing or amending an energy-conservation standard under EPCA, the Error Correction Regulation requires DOE to post the signed final rule on its website for a 45-day error-correction period. *Id.* § 430.5(c).

71.   The "posting of an energy conservation standards rule signals the end of DOE's substantive analysis and decision-making regarding the applicable standards." 81 Fed. Reg. 57,745, 57,751 (Aug. 24, 2016).

72.   During the 45-day period, any person may identify a potential error in the rule and request that DOE correct it. 10 C.F.R. § 430.5(d). An error is defined as "an aspect of the regulatory text of a rule that is inconsistent with what [DOE] intended regarding the rule at the time of posting." *Id.* § 430.5(b). This could include the following types of errors:

   a.   a "typographical mistake that causes the regulatory text to differ from how the preamble to the rule describes the rule";

   b.   a "calculation mistake that causes the numerical value of an energy conservation standard to differ from what technical support documents would justify";

   c.   a "numbering mistake that causes a cross-reference to lead to the wrong text." *Id.*

73.   Disagreement with substantive policy choices made by DOE is not a valid basis for an error-correction request. *Id.* § 430.5(d)(2)(ii). Evidence substantiating a request must be in the record of the rulemaking itself; DOE will not consider new evidence. *Id.* § 430.5(d)(3).

74.   DOE must take one of three actions after the 45-day public-review period ends:

   a.   If DOE receives a request for correction but decides not to make any corrections, it "will submit the rule for publication to the Office of the Federal Register as it was posted." *Id.* § 430.5(f)(1).

   b.   If DOE receives no requests, it "will in due course submit the rule, as it was posted . . . , to the Office of the Federal Register for publication. This will occur after" the 45-day public-review period "has elapsed." *Id.* § 430.5(f)(2).

22

c.    If DOE receives a request and determines that a correction is necessary, it "will, absent extenuating circumstances, submit a corrected rule for publication in the Federal Register within 30 days" after the 45-day public-review period "has elapsed." *Id.* § 430.5(f)(3).

Administrative Procedure Act

75.    The Administrative Procedure Act, as amended by the Freedom of Information Act, mandates that "[e]ach agency shall separately state and currently publish in the Federal Register . . . substantive rules of general applicability adopted as authorized by law." 5 U.S.C. § 552(a)(1)(D).

76.    The Administrative Procedure Act also provides for judicial review of agency action, *id.* § 702, and authorizes the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

Federal Register Act

77.    The Federal Register Act instructs that documents "required or authorized to be published by section 1505 of this title shall be filed with the Office of the Federal Register." 44 U.S.C. § 1503.

78.    Section 1505(a)(3) of the Federal Register Act provides, in turn, that "[t]here shall be published in the Federal Register . . . documents or classes of documents that may be required so to be published by Act of Congress." *Id.* § 1505(a)(3). Under the Administrative Procedure Act, this includes agency rules.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

79.    In December 2016, DOE posted the signed Final Rules on its website. These rules establish energy-conservation standards for portable air conditioners, uninterruptible power supplies, air compressors, and commercial packaged boilers.

The Portable Air Conditioners Rule

80.    Portable air conditioners are similar to window air conditioners, but instead of being mounted in a window, they stand on the floor and use an exhaust hose to expel hot air through a window. Portable air conditioners have never been subject to an energy-conservation standard and are less efficient than other cooling equipment. On average, portable air conditioners use about

23

twice as much energy per year as new window air conditioners, which have had to meet federal

energy-conservation standards for more than 25 years. [1]



81.     In 2013, DOE proposed determining that portable air conditioners were covered

products under EPCA and invited public comment on the issue. 78 Fed. Reg. 40,403 (July 5, 2013);

*see* 42 U.S.C. § 6292(a)(20), (b) (authorizing DOE to designate appliances as covered products).

DOE made a final determination of coverage in 2016. 81 Fed. Reg. 22,514 (Apr. 18, 2016).

82.     In 2015, while still evaluating possible coverage, DOE released a preliminary

technical analysis of potential energy-conservation standards for portable air conditioners and

announced a public meeting and comment period for discussion of the analysis. 80 Fed. Reg. 10,628

(Feb. 27, 2015). In June 2016, DOE issued a proposed rule setting forth energy-conservation

standards for portable air conditioners, announced a public meeting, and invited public comment. 81

Fed. Reg. 38,398 (June 13, 2016).

83.     On December 28, 2016, DOE's Acting Assistant Secretary for Energy Efficiency and

Renewable Energy signed a final rule establishing energy-conservation standards for portable air

---

[1] All photos in this Consolidated Complaint are intended to be illustrative and do not
necessarily represent the specific products that would be regulated under the standards at issue.

conditioners. On the same day, DOE posted the signed and dated final rule on its website with the following notice:

> The text of this rule is subject to correction based on the identification of errors as defined in 10 CFR 430.5 before publication in the Federal Register. Readers are requested to notify DOE by email at ErrorCorrectionInfo@EE.DOE.Gov of any typographical or other errors, as described in such regulations, by no later than midnight on February 11, 2017, in order that DOE may make any necessary corrections in the regulatory text submitted to the Office of the Federal Register for publication.

84.     DOE concluded that the energy-conservation standards in the portable air conditioners final rule "represent the maximum improvement in energy efficiency that is technologically feasible and economically justified, and would result in significant conservation of energy." The agency projected that the standards would save approximately 0.49 quads of energy over a 30-year period, and would save consumers up to about $3 billion.[2] According to DOE, these savings will also avoid emissions of approximately 25.6 million metric tons of carbon dioxide—equivalent to the annual emissions of 5.4 million cars—as well as 16,400 tons of sulfur dioxide, 32,200 tons of nitrogen oxides, and emissions of methane, nitrous oxide, and mercury.

85.     On information and belief, DOE did not receive any communications claiming to identify errors in the portable air conditioners final rule.

86.     On information and belief, as of the date of this Consolidated Complaint, DOE has not submitted the portable air conditioners final rule to the Office of the Federal Register for publication.

---

[2] This estimate of consumer savings, and the estimates given for the rules discussed in the following paragraphs, represents the estimated total value of future utility bill savings minus the estimated costs of purchasing new products.

The Uninterruptible Power Supplies Rule

87.     Uninterruptible power supplies are backup battery and charging systems that operate automatically to keep electronics running when the power fluctuates or goes out. They are used with desktop computers and other sensitive electronic devices in homes and businesses, and they consume energy to keep the backup battery charged.



88.     In a 2007 amendment to EPCA, Congress charged DOE with prescribing energy-conservation standards for battery chargers, or determining that no standard was technically feasible and economically justified, by July 1, 2011. 42 U.S.C. § 6295(u)(1)(E)(i)(II). DOE has concluded that uninterruptible power supplies are a class of battery chargers.

89.     In 2012, DOE proposed energy-conservation standards for battery chargers, including uninterruptible power supplies, invited public comment, and held a public meeting. 77 Fed. Reg. 18,478 (Mar. 27, 2012). Subsequently, DOE considered whether to regulate uninterruptible power supplies as part of a separate rulemaking on computers and battery backup systems. *See* 79 Fed. Reg. 11,345 (Feb. 28, 2014); 79 Fed. Reg. 41,656 (July 17, 2014). In June 2016, DOE issued a final rule establishing energy-conservation standards for battery chargers other than uninterruptible power supplies. 81 Fed. Reg. 38,266, 38,275 (June 13, 2016). In that rule, DOE stated that it would "continue to conduct rulemaking activities" to evaluate energy-conservation

standards for uninterruptible power supplies "as part of ongoing and future battery charger rulemaking proceedings." *Id.*

90.     In August 2016, DOE issued a proposed rule containing energy-conservation standards for uninterruptible power supplies, announced a public meeting, and invited public comment. 81 Fed. Reg. 52,196 (Aug. 5, 2016).

91.     On December 28, 2016, DOE's Acting Assistant Secretary for Energy Efficiency and Renewable Energy signed a final rule establishing energy-conservation standards for uninterruptible power supplies. On the same day, DOE posted the signed and dated final rule on its website with the following notice:

> The text of this rule is subject to correction based on the identification of errors as defined in 10 CFR 430.5 before publication in the Federal Register. Readers are requested to notify DOE by email at ErrorCorrectionInfo@EE.DOE.Gov of any typographical or other errors, as described in such regulations, by no later than midnight on February 11, 2017, in order that DOE may make any necessary corrections in the regulatory text submitted to the Office of the Federal Register for publication.

92.     The uninterruptible power supplies final rule refers to the EPCA provision requiring standards for battery chargers, 42 U.S.C. § 6295(u)(1)(E), as the source of authority for the rule.

93.     DOE concluded that the energy-conservation standards in the uninterruptible power supplies final rule "represent the maximum improvement in energy efficiency that is technologically feasible and economically justified, and would result in significant conservation of energy." The agency projected that the standards would cut energy use by approximately 0.94 quads of energy over a 30-year period, and would save consumers and businesses up to $3 billion. By some estimates, those energy savings are enough to power 7 million U.S. homes for a year. According to DOE, these savings will also avoid emissions of approximately 49 million metric tons of carbon dioxide, 39,000 tons of sulfur dioxide, and 63,000 tons of nitrogen oxides, as well as emissions of methane, nitrous oxide, and mercury.

94.     On information and belief, DOE did not receive any communications claiming to identify errors in the uninterruptible power supplies final rule.

95.     On information and belief, as of the date of this Consolidated Complaint, DOE has not submitted the uninterruptible power supplies final rule to the Office of the Federal Register for publication.

The Air Compressors Rule

96.     A compressor is a machine that reduces the volume and increases the pressure of gases. DOE's air compressors rule covers lubricated rotary air compressors rated between 10 and 200 nominal horsepower. These compressors are used to power commercial and industrial equipment including manufacturing robots, pneumatic tools, and paint sprayers.



97.     In 2012, DOE proposed determining that compressors were covered products under EPCA. 77 Fed. Reg. 76,972 (Dec. 31, 2012); 78 Fed. Reg. 8998 (Feb. 7, 2013) (reopening the public comment period); *see* 42 U.S.C. §§ 6311(1)(L), 6312(b) (authorizing DOE to designate industrial equipment as covered products). DOE issued a final determination of coverage in 2016. 81 Fed. Reg. 79,991 (Nov. 15, 2016).

98.     In 2014, DOE published a framework document that discussed potential energy-conservation standards for compressors, announced a public meeting, and invited public comment.

79 Fed. Reg. 6839 (Feb. 5, 2014); *see* 79 Fed. Reg. 15,061 (Mar. 18, 2014) (extending the comment period).

99.     In May 2016, DOE proposed a definition for the term "compressor," 81 Fed. Reg. 27,220, 27,226 (May 5, 2016), and proposed energy-conservation standards for certain types of air compressors, 81 Fed. Reg. 31,680 (May 19, 2016). DOE held a public meeting to discuss the proposed standards and invited public comment.

100.     On December 5, 2016, DOE's Acting Assistant Secretary for Energy Efficiency and Renewable Energy signed a final rule establishing energy-conservation standards for air compressors. On the same day, DOE posted the signed and dated final rule on its website with the following notice:

> The text of this rule is subject to correction based on the identification of errors as defined in 10 CFR 430.5 before publication in the Federal Register. Readers are requested to notify DOE by email at ApplianceStandardsQuestions@ee.doe.gov of any typographical or other errors, as described in such regulations, by no later than midnight on January 19, 2017, in order that DOE may make any necessary corrections in the regulatory text submitted to the Office of the Federal Register for publication.

101.     DOE concluded that the energy-conservation standards in the air compressors final rule "represent the maximum improvement in energy efficiency that is technologically feasible and economically justified, and will result in significant conservation of energy." The agency projected that the standards would cut energy use by approximately 0.16 quads of energy over a 30-year period, and would save businesses up to $450 million. According to DOE, these savings will also avoid emissions of approximately 8.2 million metric tons of carbon dioxide, 6,500 tons of sulfur dioxide, and 11,000 tons of nitrogen oxides, as well as emissions of methane, nitrous oxide, and mercury.

102.     On information and belief, DOE did not receive any communications claiming to identify errors in the air compressors final rule.

103.   On information and belief, as of the date of this Consolidated Complaint, DOE has not submitted the air compressors final rule to the Office of the Federal Register for publication.

The Commercial Packaged Boilers Rule

104.   Commercial packaged boilers are used to heat commercial and multifamily residential buildings. They are powered by oil or natural gas and are generally used in buildings with a central distribution system that circulates steam or hot water from the boiler to other parts of the building. Nearly a quarter of the commercial floor space in the United States is heated by packaged boilers, and space heating uses far more energy than any other activity in these and other commercial buildings.



105.   The American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) publishes Standard 90.1, a model energy-efficiency code for commercial buildings. ASHRAE Standard 90.1 sets energy-efficiency levels for several types of heating and cooling equipment used in these buildings, including commercial packaged boilers. EPCA mandates that if ASHRAE amends Standard 90.1 with respect to commercial packaged boilers, DOE must adopt amended energy-conservation standards at the ASHRAE level, unless DOE determines that adoption of a more stringent standard would be justified. 42 U.S.C. § 6313(a)(6)(A)(ii).

106. Additionally, EPCA requires DOE to review its energy-conservation standards for commercial packaged boilers every six years and either determine that the standards do not need to be amended or propose amended standards. *Id.* § 6313(a)(6)(C)(i). If DOE proposes new standards, then it must publish a final rule within two years. *Id.* § 6313(a)(6)(C)(iii).

107. DOE last amended its energy-conservation standards for commercial packaged boilers in July 2009, when it adopted the levels set by a revision of ASHRAE Standard 90.1. 74 Fed. Reg. 36,312 (July 22, 2009). DOE was required to review the standards and either determine that they did not need to be amended, or propose new standards, by July 22, 2015. 42 U.S.C. § 6313(a)(6)(C)(i).

108. In 2013, DOE published a framework document that discussed DOE's anticipated approach to reviewing the energy-conservation standards for commercial packaged boilers, announced a public meeting, and invited public comment. 78 Fed. Reg. 54,197 (Sept. 3, 2013).

109. In 2014, DOE published a preliminary technical analysis of potential energy-conservation standards for commercial packaged boilers, announced another public meeting, and invited public comment. 79 Fed. Reg. 69,066 (Nov. 20, 2014).

110. In March 2016, DOE proposed amended energy-conservation standards for commercial packaged boilers, announced a public meeting to discuss the proposed standards, and invited public comment. 81 Fed. Reg. 15,836 (Mar. 24, 2016).

111. On December 28, 2016, DOE's Acting Assistant Secretary for Energy Efficiency and Renewable Energy signed a final rule establishing amended energy-conservation standards for commercial packaged boilers. On the same day, DOE posted the signed and dated final rule on its website with the following notice:

> The text of this rule is subject to correction based on the identification of errors as defined in 10 CFR 430.5 before publication in the Federal Register. Readers are requested to notify DOE by email at ErrorCorrectionInfo@EE.DOE.Gov of any typographical or other errors, as described in such regulations, by no later than midnight on February 11, 2017, in order that DOE may make any necessary

31

1    corrections in the regulatory text submitted to the Office of the Federal Register

2    for publication.

3        112.    DOE concluded that the amended energy-conservation standards in the commercial

4    packaged boilers final rule "represent significant additional energy conservation and are

5    technologically feasible and economically justified." The agency projected that the standards would

6    cut energy use by approximately 0.27 quads of energy over a 30-year period, and would save

7    customers up to nearly $2 billion. By some estimates, those energy savings are enough to heat all

8    the natural gas-heated homes in New England for a year and a half. According to DOE, these

9    savings will also avoid emissions of approximately 16 million metric tons of carbon dioxide, 3,100

10   tons of sulfur dioxide, and 41,000 tons of nitrogen oxides, as well as emissions of methane, nitrous

11   oxide, and mercury.

12       113.    During the 45-day error-correction period, DOE received three letters from industry

13   trade associations and a natural gas distribution company claiming to identify errors in the

14   commercial packaged boilers final rule.

15       114.    On information and belief, as of the date of this Consolidated Complaint, DOE has

16   not submitted the commercial packaged boilers final rule to the Office of the Federal Register for

17   publication.

**FIRST CLAIM FOR RELIEF**

**(Failure to Perform a Nondiscretionary Duty under EPCA)**

20       115.    Plaintiffs incorporate by reference all preceding paragraphs.

21       116.    Once DOE has posted a signed, final energy-conservation-standards rule on its

22   website pursuant to the agency's error-correction regulation, the required 45-day period for public

23   review has passed, and, if necessary, DOE has corrected any errors identified in the rule, DOE is

24   required to submit the rule for publication in the Federal Register. 10 C.F.R. § 430.5.

25       117.    DOE's failure to submit the portable air conditioners rule, the uninterruptible power

26   supplies rule, the air compressors rule, and the commercial packaged boilers rule for publication in

27   the Federal Register following the conclusion of the error-correction period for each rule violates 10

28

C.F.R. § 430.5, and constitutes a failure to perform a nondiscretionary duty under EPCA, 42 U.S.C. § 6305(a)(2).

## SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act)

118.     Plaintiffs incorporate by reference all preceding paragraphs.

119.     In the alternative, once DOE has adopted a substantive rule of general applicability, the Administrative Procedure Act requires the agency to publish the rule in the Federal Register. 5 U.S.C. § 552(a)(1)(D).

120.     DOE adopted the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule, each of which was signed and dated by the Acting Assistant Secretary and posted on the agency's website.

121.     DOE's failure to publish the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule in the Federal Register violates the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D), and constitutes an agency action unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1).

## THIRD CLAIM FOR RELIEF

### (Violation of the Federal Register Act)

122.     Plaintiffs incorporate by reference all preceding paragraphs.

123.     The Federal Register Act provides that documents "shall be filed with the Office of the Federal Register," 44 U.S.C. § 1503, if an Act of Congress requires that they be published in the Federal Register, *id.* § 1505(a).

124.     The Administrative Procedure Act is an Act of Congress requiring that "substantive rules of general applicability" be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D).

125.     The portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule are substantive rules of general applicability that DOE adopted as authorized by law. *Id.*

126.     DOE's failure to file the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule with the Office of

the Federal Register for publication violates the Federal Register Act, 44 U.S.C. §§ 1503 and 1505, and constitutes an agency action unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1).

## FOURTH CLAIM FOR RELIEF

### (Failure to Comply with a Statutory Deadline under EPCA)

127.   Plaintiffs incorporate by reference all preceding paragraphs.

128.   Congress required DOE, not later than July 1, 2011, to prescribe energy-conservation standards for battery chargers, or to determine that no standard was technically feasible and economically justified. 42 U.S.C. § 6295(u)(1)(E)(i)(II).

129.   Although DOE published a final rule in June 2016 that established energy-conservation standards for some classes of battery chargers, DOE did not in that rule prescribe energy-conservation standards for uninterruptible power supplies or determine that no standard for uninterruptible power supplies was technically feasible and economically justified. 81 Fed. Reg. 38,266 (June 13, 2016).

130.   By failing to publish a final rule prescribing energy-conservation standards for uninterruptible power supplies, DOE has violated the statutory deadline for publication of the final rule required in 42 U.S.C. § 6295(u)(1)(E)(i)(II). DOE has thereby failed "to comply with a nondiscretionary duty to issue a . . . final rule according to the schedules set forth in section 6295." *Id.* § 6305(a)(3).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.   Advance on the docket and expedite the decision of this case pursuant to 42 U.S.C. § 6305(a);

2.   Declare that defendants are each in violation of the Energy Policy and Conservation Act, or, in the alternative, the Administrative Procedure Act and the Federal Register Act, as described above;

3.   Enjoin defendants to ensure publication of the portable air conditioners rule, the uninterruptible power supplies rule, the air compressors rule, and the commercial packaged boilers rule in the Federal Register immediately;

34

1      4.      Grant plaintiffs their costs of suit, including reasonable attorney fees;

2      5.      Grant plaintiffs such further relief as is necessary and appropriate.

3

4   Dated: September 8, 2017          Respectfully submitted,

5
                                     /s/ Jennifer A. Sorenson
6                                    JENNIFER A. SORENSON (SBN 268665)
                                     Natural Resources Defense Council
7                                    111 Sutter Street, 21st Floor
                                     San Francisco, CA 94104
8                                    Telephone: (415) 875-6164
                                     Fax: (415) 795-4799
9                                    E-mail: jsorenson@nrdc.org

10
11                                   AARON COLANGELO, *pro hac vice*
                                     Natural Resources Defense Council
12                                   1152 15th Street, NW, Suite 300
                                     Washington, DC 20005
13                                   Telephone: (202) 289-2376
                                     Fax: (415) 795-4799
14                                   E-mail: acolangelo@nrdc.org

15
                                     *Counsel for Plaintiff Natural Resources*
16                                   *Defense Council*

17   Dated: September 8, 2017          /s/ Timothy D. Ballo
18                                   TIMOTHY D. BALLO, *pro hac vice*
                                     Earthjustice
19                                   1625 Massachusetts Avenue, NW
                                     Suite 702
20                                   Washington, DC 20036
                                     Telephone: (202) 745-5209
21                                   Fax: (202) 667-2356
                                     E-mail: tballo@earthjustice.org
22

23

24

25

26

27

28

35

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
Nos. 17-cv-03404-VC and 17-cv-03406-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREGORY C. LOARIE (SBN 215859)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Telephone: (415) 217-2000
Fax: (415) 217-2040
E-mail: gloarie@earthjustice.org

*Counsel for Plaintiffs Sierra Club,*
*Consumer Federation of America, and*
*Texas Ratepayers' Organization to Save Energy*

Dated: September 8, 2017

XAVIER BECERRA
Attorney General of California
SUSAN S. FIERING
Supervising Deputy Attorney General

/s/ Jamie Jefferson
JAMIE JEFFERSON
SOMERSET PERRY
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0280
Fax: (510) 622-2270
E-mail: Jamie.Jefferson@doj.ca.gov

*Attorneys for the Plaintiff the People of the State of California,*
*by and through Attorney General Xavier Becerra*

36

Dated: September 8, 2017

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Plaintiff State of New York

/s/ Timothy Hoffman
TIMOTHY HOFFMAN
LISA KWONG, *pro hac vice*
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Bureau
The Capitol
Albany, New York 12224
Tel: (716) 853-8465
(518) 776-2422
Email: Timothy.Hoffman@ag.ny.gov
Lisa.Kwong@ag.ny.gov

Dated: September 8, 2017

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
ANNADEL A. ALMENDRAS
Supervising Deputy Attorney General

/s/ Bryant B. Cannon
BRYANT B. CANNON
Deputy Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Telephone: (415) 703-1614
Fax: (415) 703-5480
Email: Bryant.Cannon@doj.ca.gov

*Attorneys for the California State Energy Resources*
*Conservation and Development Commission*

37

Dated: September 8, 2017

GEORGE JEPSEN
Attorney General of the State of Connecticut
Attorney for Plaintiff State of Connecticut

/s/ Robert Snook
ROBERT SNOOK, *pro hac vice*
MATTHEW LEVINE
Assistant Attorneys General
Office of the Attorney General
55 Elm Street
Hartford, Connecticut 06141-0120
Tel: (860) 808-5250
Email: Robert.Snook@ct.gov

Dated: September 8, 2017

LISA MADIGAN
Attorney General of the State of Illinois
Attorney for Plaintiff State of Illinois

/s/ James P. Gignac
JAMES P. GIGNAC, *pro hac vice*
Assistant Attorney General
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, Illinois 60602
Tel: (312) 814-0660
Email: jgignac@atg.state.il.us

Dated: September 8, 2017

JANET T. MILLS
Attorney General of the State of Maine
Attorney for Plaintiff State of Maine

/s/ Katherine Tierney
KATHERINE TIERNEY, *pro hac vice*
Assistant Attorney General
Office of the Attorney General
State House Station 6
Augusta, ME 04333-0006
Tel: (207) 626-8800
Email: katherine.tierney@maine.gov

38

1  Dated: September 8, 2017

BRIAN E. FROSH
Attorney General of the State of Maryland

2

/s/ Steven M. Sullivan

3  STEVEN M. SULLIVAN, *pro hac vice*
Solicitor General

4  Office of the Attorney General

5  200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202

6  Tel: (410) 576-6427

7  Email: ssullivan@oag.state.md.us

8  Dated: September 8, 2017

MAURA HEALEY
Attorney General of the Commonwealth of Massachusetts

9  Attorney for Plaintiff Commonwealth of Massachusetts

10  /s/ I. Andrew Goldberg

11  I. ANDREW GOLDBERG, *pro hac vice*
Assistant Attorney General

12  Office of the Attorney General

13  One Ashburton Place, 18th Floor
Boston, Massachusetts 02108

14  Tel: (617) 963-2429

15  Email: andy.goldberg@state.ma.us

16  Dated: September 8, 2017

State of Minnesota, by and through its Minnesota Department
of Commerce and Minnesota Pollution Control Agency

17  Office of the Attorney General

18  Attorney for Plaintiff State of Minnesota, by and through its
Minnesota Department of Commerce and Minnesota Pollution

19  Control Agency

20  /s/ Max Kieley

21  MAX KIELEY, *pro hac vice pending*
Assistant Attorney General

22  445 Minnesota Street, Suite 900

23  St. Paul, Minnesota 55101-2127
Tel: (651) 757-1244

24  Email: max.kieley@ag.state.mn.us

25

26

27

28

39

Dated: September 8, 2017

ELLEN F. ROSENBLUM
Attorney General of the State of Oregon
Attorney for Plaintiff State of Oregon

/s/ Jesse Ratcliffe
JESSE RATCLIFFE, *pro hac vice*
Office of the Attorney General
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
Tel: (503) 947-4549
Email: jesse.d.ratcliffe@doj.state.or.us

Dated: September 8, 2017

JOSH SHAPIRO
Attorney General of the Commonwealth of Pennsylvania
Attorney for Plaintiff Commonwealth of Pennsylvania

/s/ Steven J. Santarsiero
STEVEN J. SANTARSIERO, *pro hac vice*
MICHAEL J. FISCHER, *pro hac vice pending*
Chief Deputy Attorneys General
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-3391
Email: ssantarsiero@attorneygeneral.gov
mfischer@attorneygeneral.gov

Dated: September 8, 2017

THOMAS J. DONOVAN, JR.
Attorney General of the State of Vermont
Attorney for Plaintiff State of Vermont

/s/ Laura B. Murphy
LAURA B. MURPHY, *pro hac vice*
Assistant Attorney General
Environmental Protection Division
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Tel: (802) 828-1059
Email: laura.murphy@vermont.gov

40

Dated: September 8, 2017         BOB FERGUSON
Attorney General of Washington
Attorney for Plaintiff State of Washington

/s/ Laura J. Watson
LAURA J. WATSON, *pro hac vice*
Senior Assistant Attorney General
Washington State Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
Tel: (360) 586-6743
Email: laura.watson@atg.wa.gov

Dated: September 8, 2017         KARL A. RACINE
Attorney General of the District of Columbia

*/s/* Robyn Bender
ROBYN BENDER
Deputy Attorney General
BRIAN CALDWELL, *pro hac vice pending*
Assistant Attorney General
Office of the Attorney General of the District of Columbia
Public Advocacy Division
441 Fourth Street, N.W. Ste # 600-S
Washington, D.C. 20001
Tel: (202) 724-6610
     (202)727-6211
Email: Robyn.Bender@dc.gov
      Brian.Caldwell@dc.gov

Dated: September 8, 2017         ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Plaintiff City of New York

/s/ Susan E. Amron
SUSAN E. AMRON, Chief
Environmental Law Division
SARAH KOGEL-SMUCKER, Senior Counsel, *pro hac vice*
New York City Law Department
100 Church Street, Room 6-146
New York, New York 10007
Tel: (212) 356-2070
(212) 356-2315
Email: samron@law.nyc.gov
skogel@law.nyc.gov

Exhibit A

**STATE OF NEW YORK**
**STATE OF CALIFORNIA**
**STATE OF CONNECTICUT**
**STATE OF ILLINOIS**
**STATE OF MAINE**
**STATE OF MARYLAND**
**COMMONWEALTH OF MASSACHUSETTS**
**STATE OF OREGON**
**PENNSYLVANIA DEPARTMENT OF**
**ENVIRONMENTAL PROTECTION**
**STATE OF VERMONT**
**STATE OF WASHINGTON**
**CITY OF NEW YORK**

April 3, 2017

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Hon. James R. Perry, Secretary
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

      Re:    Failure to Submit Final Rules for Publication in Federal Register/
               60-Day Notice Letter for Violation of Energy Policy and Conservation
               Act, 42 U.S.C. §§ 6291 *et seq*. and Error Correction Rule,
               <u>10 C.F.R. § 430.5(f)</u>

Dear Secretary Perry:

      We write to express our deep concern over the failure of the Department of Energy
("DOE") to submit for publication in the Federal Register five energy efficiency standards the
agency issued in December 2016.[1] These efficiency standards, applicable to air compressors,
commercial packaged boilers, portable air conditioners, walk-in coolers and freezers, and
uninterruptible power supplies, were promulgated under the Energy Policy and Conservation Act
("EPCA"), 42 U.S.C. §§ 6291 *et seq*. These standards, developed with extensive input from
interested stakeholders, were set forth in "final rules" signed and dated by the DOE Assistant
Secretary, and posted for pre-publication error correction review pursuant to 10 C.F.R. § 430.5.

---

[1]

https://energy.gov/sites/prod/files/2016/12/f34/Compressors_Standards_Final_Rule.pdf;https://energy.gov/sites/prod
/files/2016/12/f34/CPB_ECS_Final_Rule.pdf;
https://energy.gov/sites/prod/files/2016/12/f34/PAC_ECS_Final_Rule.pdf;
https://energy.gov/sites/prod/files/2016/12/f34/WICF_ECS_Final_Rule 0.pdf;
https://energy.gov/sites/prod/files/2016/12/f34/UPS_ECS_Final_Rule.pdf.

As such, the standards represent the culmination of DOE's substantive review and analysis, and reflect the agency's determination that they will result in significant energy conservation, are technologically feasible, and economically justified. 42 U.S.C. § 6295(o)(2)(a). The period for submission of correction requests under DOE's error correction rule has closed, and the time for DOE's required submission of the rules for publication in the Federal Register has also passed. We therefore urge DOE to immediately publish the standards in full compliance with its statutory obligations under EPCA and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

This letter serves as notice, pursuant to 42 U.S.C. §§ 6305(a) and (b), that DOE's failure to submit the five standards for publication in the Federal Register violates the Department's non-discretionary duty under EPCA and the DOE's error correction rule, 10 C.F.R. § 430.5(f). In the event DOE fails, or refuses, to perform its discrete, non-discretionary duty within 60 days, the undersigned states intend to commence litigation seeking, among other things, an order directing DOE to immediately submit the rules for publication in full compliance with the law.

I.   Energy Policy and Conservation Act, 42 U.S.C. §§ 6291 *et seq.*

Adopted in the aftermath of the 1973 oil crisis, the Energy Policy and Conservation Act of 1975 created a comprehensive approach to federal energy policy. Congress' primary goals in adopting EPCA included reducing domestic energy demand and increasing energy efficiency. EPCA Chapter III, Part A establishes the Energy Conservation Program for Consumer Products Other Than Automobiles, 42 U.S.C. §§ 6291-6309, and gives DOE the authority to develop, revise, and implement minimum energy conservation standards for a variety of appliances and equipment. 42 U.S.C. § 6295. Although Congress established initial federal energy efficiency standards for almost two dozen consumer and commercial products, Congress also imposed upon DOE the nondiscretionary duty to propose and complete rulemakings by specified deadlines to consider revising these standards. For the most part, states are preempted from establishing their own efficiency standards for products regulated by DOE, 42 U.S.C. § 6297, making timely and full implementation of the law by DOE all the more important.

EPCA provides that when considering whether to revise an efficiency standard for a consumer product, DOE must select that standard that is "designed to achieve the maximum improvement in energy efficiency ... which the Secretary determines is technologically feasible and economically justified." 42 U.S.C. § 6295(o)(2)(A). Under EPCA's anti-backsliding provision, 42 U.S.C. § 6295(o)(1), DOE lacks authority to weaken an energy efficiency standard once it has been established by Congress or by a subsequent rulemaking. *See NRDC v. Abraham*, 355 F.3d 179 (2d Cir. 2004). For most types of commercial equipment covered by the statute, as with consumer products, DOE must periodically revise the initial efficiency standards.

II.   Economic and Environmental Benefits of Energy Efficiency Standards

DOE is authorized under EPCA and its amendments to set minimum energy conservation standards for approximately 60 categories of appliances and equipment used in residences and businesses. It is widely-recognized by federal, state and local governments, industry, the scientific community, consumers and society at-large, that appliance efficiency standards are feasible and economical. A February 2017 report by the Appliance Standards Awareness Project

(ASAP) and the American Council for Energy Efficient Economy (ACEEE) entitled, "Energy-Savings States of America: How Every State Benefits from National Appliance Standards" indicates that consumers and businesses saved an estimated $80 billion on utility bills from existing standards in 2015, and that savings from these standards will grow to nearly $150 billion by 2030.[2]  On a cumulative basis, counting both costs and benefits for products sold between 1987 and 2035, total net present value savings from national standards is estimated at $2.4 trillion for U.S. consumers and businesses. According to DOE's website, "Standards saved American consumers $63 billion on their utility bills in 2015, and cumulatively, have helped the United States avoid 2.6 billion tons of carbon dioxide emissions." Thus, DOE's efficiency standards for appliances significantly reduce U.S. energy consumption, lower emissions of greenhouse gases, and save consumers billions of dollars annually. In fact, recent data show that appliance efficiency standards provide the second largest energy savings of all energy conservation programs and initiatives, utility sector energy-efficiency programs, federal tax incentives, and other major national initiatives.[3]

III.   DOE Final Rules Setting Efficiency Standards for Air Compressors, Commercial Packaged Boilers, Portable Air Conditioners, Walk-in Coolers and Freezers, and Uninterruptible Power Supplies

In December 2016, DOE concluded its multi-year efforts to develop and/or update efficiency standards for air compressors, commercial packaged boilers, portable air conditioners, walk-in coolers and freezers, and uninterruptible power supplies by issuing final rules, signed by DOE's Assistant Secretary for Energy Efficiency and Renewable Energy, setting forth new energy conservation standards.  For each product rule, DOE determined that the newly adopted standard represents the "maximum improvement in energy efficiency that is technologically feasible and economically justified, and will result in significant conservation of energy."  Prior to publication in the Federal Register, DOE posted pre-publication versions of the final rules on its website to begin the error correction review process specified under 10 C.F.R. § 430.5.[4] ·

---

[2]  https://appliance-standards.org/sites/default/files/Appliances%20standards%20white%20paper%202%202-14-17.pdf

[3]  See Appliance Standards Awareness Project, April 6, 2016 Press Release, "Little Known Federal Appliance Standards Rank as #2 Energy-Saving Tool in U.S., Will Play Major Role in Meeting Paris Climate Target". https://appliance-standards.org/sites/default/files/Appliance%20Standards%20national%20news%20release.pdf In 2014, energy savings from appliance standards was surpassed only by EPA/NHTSA's corporate average fuel economy (CAFE) standards for cars and trucks.

[4]  DOE's error correction rule, 10 C.F.R. § 430.5(f), provides in pertinent part:
    (f)  Publication in the Federal Register.
    (1)  If, after receiving one or more properly filed requests for correction, the Secretary decides not to undertake any corrections, the Secretary will submit the rule for publication to the Office of the Federal Register as it was posted pursuant to paragraph (c)(1) of this section.
    (2)  If the Secretary receives no properly filed requests after posting a rule and identifies no Errors on the Secretary's own initiative, the Secretary will in due course submit the rule, as it was posted pursuant to paragraph (c)(1) of this section, to the Office of the Federal Register for publication. This will occur after the period prescribed by paragraph (c)(2) of this section has elapsed.

## A. Error Correction Rule, 10 C.F.R. 430.5

Under the DOE's "error correction rule," 10 C.F.R. § 430.5, DOE is required to post a final rule establishing or amending an energy efficiency standard on the agency's publicly-accessible website for 45 days prior to submission for publication in the Federal Register. The rule affords DOE and interested parties a limited window of opportunity to alert the agency to non-policy errors (i.e., typographical, calculation or numbering errors) in the regulatory text of a final rule, and request corrections. It further provides DOE a period of time (up to 30 days) to consider correction requests and make any necessary corrections before submission of a rule for publication. Thus, DOE's own rules require that it submit a final standard-setting rule—as originally posted or with corrections—to the Federal Register for publication within 30 days after the close of the 45-day correction request and review period. Only in the event of extenuating circumstances, such as where an error relates to a particularly complex engineering analysis, is departure from these time restrictions permitted.[5]  DOE has acknowledged that it "takes the timelines in EPCA as signals of congressional concern that standards rulemakings should not be unnecessarily delayed." 81 Fed. Reg. at 57753.

By its terms, the error correction rule does not permit DOE to maintain a signed final rule in a state of limbo: that is, issued but non-enforceable for lack of publication. To the contrary, in specifying that "DOE will submit the rule for publication," the error correction rule imposes a non-discretionary duty to do so within the permitted timeframe (within 30 days after the 45-day correction request period).  10 C.F.R. § 430.5(f)(3). Where DOE receives no correction requests for a final rule, it must submit the rule for publication as-is, "in due course."  10 C.F.R. § 430.5(f)(3).

The term "will" imposes a mandatory duty no different than the terms "shall" or "must." *Summit Packaging Sys. v. Kenyon & Kenyon*, 273 F.3d 9, 12 (1st Cir. 2001) (interpreting contractual phrase "will be submitted" and citing Black's Law Dictionary).  The error correction rule therefore commands the DOE Secretary to timely submit the rules for Federal Register publication.  This is a discrete, non-discretionary agency action that a reviewing court may compel as "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62-65 (2004).  The non-discretionary nature of DOE's duty to publish the rules is further supported by DOE's acknowledgement that "the posting of an energy conservation standards rule signals the end of DOE's substantive analysis and decision-making regarding the applicable standards."[6]  Furthermore, "the Department posts a

---

(3) If the Secretary receives a properly filed request after posting a rule pursuant to (c)(1) and determines that a correction is necessary, the Secretary will, absent extenuating circumstances, submit a corrected rule for publication in the Federal Register within 30 days after the period prescribed by paragraph (c)(2) of this section has elapsed.

[5] 81 Fed. Reg. 57745, 57750 (Aug. 24, 2016).

[6] 81 Fed. Reg. at 57751.

rule with the appropriate official's signature only after concluding its deliberations and reaching decisions on the relevant factual determinations and policy choices."[7]

We are aware of no error correction requests received by DOE for four of the five final rules. And although several correction requests by industry were posted on DOE's commercial packaged boilers rulemaking docket, none of them appear to have identified errors as defined by the error correction rule. Under these circumstances, DOE's time to transmit the five rules (including the commercial boilers rule) for publication expired, at the latest, on March 15, 2017.[8] But DOE has yet to submit the rules for publication in accordance with 10 C.F.R. § 430.5(f).

### B. Consequence of DOE's Failure to Publish the Five Efficiency Standards

The consequence of DOE's failure to publish the rules is significant. The rulemaking dockets for each of the standards identify significant reductions in electricity consumption and pollution emissions that will be achieved as a result of the rules.[9] A summary of these estimated energy savings and the emissions reductions is presented in Appendix A to this letter.[10] Summaries of the estimated monetized value of these benefits are presented in Appendix B.[11] Both appendices are attached hereto and incorporated by reference. Yet, with continued publication delays, the projected economic, environmental and public health benefits of the rules will also be delayed, as manufacturers' compliance dates are measured from the rules' effective dates.[12]

---

[7] 81 Fed. Reg. 26999 (May 5, 2016).

[8] DOE was required to submit the air compressor rule to the Federal Register for publication by no later than February 21, 2017.

[9] For example, the new standards for walk-in coolers and freezers are expected to yield a 24% savings in energy use for those products over a thirty-year period. Similarly, the estimated cumulative reduction in $CO_2$ emissions through 2030 is equivalent to emissions resulting from the annual electricity use of more than 783,000 homes. Walk-In Coolers and Freezers Final Rule (WICF Rule) (posted December 28, 2016) at pp.12-13.

[10] This summary is based on figures presented in DOE's cost-benefit analysis for each of the five final rules and estimates prepared by the Appliance Standard Awareness Project.

[11] These summaries were prepared by DOE and presented in Air Compressor Final Rule (posted December 5, 2016), Table I.3, Summary of Economic Benefits and Costs of Adopted Energy Conservation Standards for Air Compressors at pp.13-14; Commercial Packaged Boilers Final Rule (posted December 28, 2016), Table I.3, Selected Categories of National Economic Benefits and Costs of Energy Conservation Standards for Commercial Packaged Boilers (TSL2) at p.14; Portable Air Conditioners Final Rule (posted December 28, 2016), Table I.3, Selected Categories of Economic Benefits and Costs of New Energy Conservation Standards for Portable Air Conditioners (TSL2) at p.13; WICF Rule , Table I.3, Selected Categories of Economic Benefits and Costs of Adopted Energy Conservation Standards for the Considered WICF Refrigeration Systems (TSL3) at pp.15-16; and Uninterruptible Power Supplies Final Rule (posted December 28, 2016), Table I.3, Selected Categories of Economic Benefits and Costs of Adopted Energy Conservation Standards for UPSs at pp.12-13.

[12] For walk-in coolers and freezers, DOE estimates that the new standards will result in net benefits of over $200 million annually. WIFC Rule, Table I.4, Selected Categories of Annualized Benefits and Costs of Adopted Standards (TSL3) for WICF Refrigeration Systems at p.18. Thus, even a delay of several months can result in a significant loss of economic benefits from the rule.

Thus, leaving the final rules in regulatory "limbo" has very real, negative economic and environmental consequences, essentially frustrating Congress' energy conservation goals under EPCA. Without the benefit of enforceable efficiency standards for air compressors, commercial packaged boilers, portable air conditioners, walk-in coolers and freezers, and uninterruptible power supplies, electricity and natural gas consumption will increase, as will energy bills for states, municipalities and their residents and businesses.  Increases in fossil fuel consumption as a result of reduced efficiency will lead to increased emissions of air pollutants that negatively impact public health and the environment, including carbon dioxide and other climate-changing gases. Finally, DOE's failure to adopt improved efficiency standards will also impede state and municipal energy policies that rely on conservation and gains in energy efficiency as part of an overall strategy to transition to cleaner, safer, or more sustainable energy sources.

IV.    Citizen Suit Claim for Failure to Perform Non-Discretionary Duty

DOE's failure to timely submit the five final rules for publication in the Federal Register violates the requirements of the error correction rule, and is actionable in a citizen suit under EPCA, 42 U.S.C. § 6305(a).  Section 42 U.S.C. § 6305(a)(2) allows commencement of a civil action in federal district court against DOE, after 60-day notice to the Secretary, for "an alleged failure . . . to perform any act or duty under this part which is not discretionary." 42 U.S.C. § 6305(a)(2).  We therefore urge DOE to perform its duty under EPCA and the error correction rule, 10 C.F.R. § 430.5(f), to transmit the five final rules for publication. In the event DOE fails to do so, we intend to pursue litigation to compel performance of that duty in compliance with EPCA and DOE's error correction rule. Other parties not signatories to this letter may also join this litigation with respect to the same claims covered by this letter.

Sincerely,

ERIC T. SCHNEIDERMAN
Attorney General of the
State of New York

By:    _____

Timothy Hoffman, Assistant Attorney General
Lisa Kwong, Assistant Attorney General
Office of the Attorney General
Environmental Protection Bureau
The Capitol
Albany, New York 12224
Tel:    (716) 853-8465
        (518) 776-2422
Email: Timothy.Hoffman@ag.ny.gov
        Lisa.Kwong@ag.ny.gov

XAVIER BECERRA
Attorney General of the
   State of California

By: _____
Somerset Perry, Deputy Attorney General
Jamie Jefferson, Deputy Attorney General
Office of the Attorney General
California Department of Justice
1515 Clay St., 20th Floor
Oakland, California 94612
Tel:    (510) 879-0852
Email: Somerset.Perry@doj.ca.gov


GEORGE JEPSEN
Attorney General of the
   State of Connecticut

By: _____
Matthew Levine, Assistant Attorney General
Robert Snook, Assistant Attorney General
Office of the Attorney General
55 Elm Street
Hartford, Connecticut 06141-0120
Tel:    (860) 808-5250
Email: Robert.Snook@ct.gov


LISA MADIGAN
Attorney General of the
   State of Illinois

By: _____
James P. Gignac, Assistant Attorney General
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, Illinois 60602
Tel:    (312) 814-0660
Email: jgignac@atg.state.il.us

JANET T. MILLS
Attorney General of the
  State of Maine

By:      *Katherine Tierney / kgh*

Katherine Tierney, Assistant Attorney General
Office of the Attorney General
State House Station 6
Augusta, ME 04333-0006
Tel:    (207) 626-8800
Email: katherine.tierney@maine.gov


BRIAN E. FROSH
Attorney General of Maryland

*Brian E Frosh*

Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel:    (410) 576-6330
Email: cquattrocki@oag.state.md.us


MAURA HEALEY
Attorney General of the
  Commonwealth of Massachusetts

By:      *Andrew Goldberg / kgh*

I. Andrew Goldberg, Assistant Attorney General
Environmental Protection Division
Joseph Dorfler, Assistant Attorney General
Energy and Telecommunications Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel:   (617) 963-2429
       (617) 963-2086
Email: andy.goldberg@state.ma.us
      joseph.dorfler@state.ma.us

ELLEN F. ROSENBLUM
Attorney General of the
 State of Oregon

By: _Paul Garrahan/cem_

Paul Garrahan,
Attorney-in-Charge
Natural Resources Section
Jesse D. Ratcliffe,
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
Tel:  503-947-4342
Email:  paul.garrahan@doj.state.or.us
 jesse.d.ratcliffe@doj.state.or.us

ALEXANDRA C. CHIARUTTINI
Chief Counsel for Pennsylvania Department of
 Environmental Protection
PA Bar No. 80428

By: _Robert Reiley / CsK_

Robert A. Reiley
PA Bar No. 61319
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 16th Floor
P.O. Box 8464
Harrisburg, PA 17105-8464
Tel:     (717) 787-4449
Email: rreiley@pa.gov

THOMAS J. DONOVAN, JR.
Attorney General of the
 State of Vermont

By: _Laura Murphy /CsK_

Laura B. Murphy
Assistant Attorney General
Environmental Protection Division
Vermont Attorney General's Office
109 State Street
Montpelier, VT  05609
Tel:     (802) 828-1059
Email: laura.murphy@vermont.gov

BOB FERGUSON
Attorney General of Washington

By: _Thomas Young / Lsk_

By: Thomas J. Young
Assistant Attorney General
Washington State Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
Tel:    (360) 586-4608
Email: TomY@atg.wa.gov


ZACHARY W. CARTER
Corporation Counsel of the
  City of New York

By: _Susan Amron / Lsk_

Susan E. Amron, Chief,
  Environmental Law Division
Sarah Kogel-Smucker, Senior Counsel
New York City Law Department
100 Church Street, Room 6-146
New York, New York 10007
Tel:    (212) 356-2070
          (212) 356-2315
Email: samron@law.nyc.gov
          skogel@law.nyc.gov


cc:
Hon. Maureen Ohlhausen, Acting Chairman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Appendix A

Estimated Energy Savings and Emissions Reductions*

| Product Efficiency Standard | Electricity Saved (billion kilowatt hours)** | Equivalent Annual Electricity Consumption (million households)** | Net Cost Savings ($ billion)*** | | Emissions Reductions*** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | low | high | CO₂ (million metric tons) | CO₂ (million tons) | SO₂ (thousand tons) | NOX (thousand tons) | SO₂ + NOX (thousand tons) | CH₄ (thousand tons) | N₂O (thousand tons) | HG (tons) |
| Air compressors | 15.6 | 1.3 | 0.2 | 0.4 | 8.2 | 9.02 | 6.5 | 0.011 | 6.511 | 40.8 | 0.1 | 0.02 |
| Walk-in cooler/freezers | 90 | 7 | 1.4 | 3.2 | 46 | 50.6 | 36 | 0.058 | 36.058 | 218 | 0.7 | 0.1 |
| Portable air conditioners | 50 | 4 | 1.25 | 3 | 25.6 | 28.16 | 16.4 | 0.0322 | 16.4322 | 124.8 | 0.4 | 0.06 |
| Uninterruptible power supplies | 87 | 7 | 1.3 | 3 | 49 | 53.9 | 39 | 63 | 102 | 238 | 0.73 | 0.13 |
| Commercial packaged boilers | N/A**** | N/A | 0.5 | 2 | 16 | 17.6 | 139 | 3.1 | 286.6 | 41 | 0.1 | 0.0003 |

*Estimates are for lifetime energy savings and emissions reductions resulting from products purchased in the 30-year period that begins in the anticipated first full year of compliance with the adopted standards

**Based on estimates by the Appliance Standard Awareness Project (ASAP)

***Based on estimates by the U.S. Department of Energy (DOE)

****Natural gas savings is .27 quadrillion Btu

Appendix B                    DOE Summaries of Economic Benefits and Costs

### Table I.3 Summary of Economic Benefits and Costs of Adopted Energy Conservation Standards for Air Compressors[*]

| Category | Present Value billion 2015$ | Discount Rate percent |
|---|---|---|
| **Benefits** | | |
| Consumer Operating Cost Savings | 0.2 | 7 |
| | 0.6 | 3 |
| GHG Reduction (using avg. social costs at 5% discount rate)[**] | 0.1 | 5 |
| GHG Reduction (using avg. social costs at 3% discount rate)[**] | 0.3 | 3 |
| GHG Reduction (using avg. social costs at 2.5% discount rate)[**] | 0.5 | 2.5 |
| GHG Reduction (using 95th percentile social costs at 3% discount rate)[**] | 0.9 | 3 |
| NO$_X$ Reduction[†] | 0.006 | 7 |
| | 0.02 | 3 |
| Total Benefits[‡] | 0.5 | 7 |
| | 0.9 | 3 |
| **Costs** | | |
| Consumer Incremental Installed Costs[††] | 0.1 | 7 |
| | 0.2 | 3 |
| **Total Net Benefits** | | |
| Including GHG and NO$_X$ Reduction Monetized Value[‡] | 0.5 | 7 |
| | 0.8 | 3 |

[*] This table presents the costs and benefits associated with compressors shipped in 2022–2051. These results include benefits to consumers that accrue after 2022 from the products shipped in 2022–2051.
[**] The interagency group selected four sets of SC-CO₂ SC-CH₄, and SC-N₂O values for use in regulatory analyses. Three sets of values are based on the average social costs from the integrated assessment models, at discount rates of 5-percent, 3-percent, and 2.5-percent. The fourth set, which represents the 95th percentile of the social cost distributions calculated using a 3-percent discount rate, is included to represent higher-than-expected impacts from climate change further out in the tails of the social cost distributions. The social cost values are emission year specific. The GHG reduction benefits are global benefits due to actions that occur domestically. See section IV.L for more details.
[†] DOE estimated the monetized value of NO$_X$ emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by EPA's Office of Air Quality Planning and Standards. (Available at www.epa.gov/cleanpowerplan/clean-power-plan-

final-rule-regulatory-impact-analysis.) See section IV.L.3 for further discussion. To be conservative, DOE is primarily using a national benefit-per-ton estimate for NOX emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by EPA's Office of Air Quality Planning and Standards. See section IV.L.3 for further discussion. To be conservative, DOE is primarily using a national benefit-per-ton estimate for NOX from the Electricity Generating Unit sector based on an the low-end estimates of premature mortality used by EPA. If the benefit-per-ton estimates were based on the high-end estimates, the values would be nearly two-and-a-half times larger. If the benefit-per-ton estimates were based on the Six Cities study (Lepuele et al. 2011), the values would be nearly two-and-a-half times larger.
[‡] Total Benefits for both the 3-percent and 7-percent cases are presented using the average social costs with 3-percent discount rate.
[††] The incremental installed costs include incremental equipment cost as well as installation costs. The costs account for the incremental variable and fixed costs incurred by manufacturers due to the proposed standards, some of which may be incurred in preparation for the rule.

Appendix B                    DOE Summaries of Economic Benefits and Costs

**Table I.3 Selected Categories of National Economic Benefits and Costs of Energy Conservation Standards for Commercial Packaged Boilers (TSL 2\*)**

| Category | Present Value million 2015$ | Discount Rate |
|---|---|---|
| **Benefits** | | |
| Operating Cost Savings | 907 | 7% |
| | 2,585 | 3% |
| $CO_2$ Reduction Monetized Value (using mean SCC at 5% discount rate)[**] | 100 | 5% |
| $CO_2$ Reduction Monetized Value (using mean SCC at 3% discount rate)[**] | 482 | 3% |
| $CO_2$ Reduction Monetized Value (using mean SCC at 2.5% discount rate)[**] | 777 | 2.5% |
| $CO_2$ Reduction Monetized Value (using 95th percentile SCC at 3% discount rate)[**] | 1,468 | 3% |
| $NO_X$ Reduction[†] | 35 | 7% |
| | 99 | 3% |
| Total Benefits[‡] | 1,425 | 7% |
| | 3,166 | 3% |
| **Costs** | | |
| Incremental Installed Costs | 350 | 7% |
| | 609 | 3% |
| **Total Net Benefits** | | |
| Including $CO_2$ and $NO_X$ Reduction Monetized Value[‡] | 1,075 | 7% |
| | 2,558 | 3% |

\* This table presents the costs and benefits associated with commercial packaged boilers shipped in 2020−2049. These results include benefits to consumers that accrue after 2049 from the equipment purchased in 2020-2049. The incremental installed costs include incremental equipment cost as well as installation costs. The $CO_2$ reduction benefits are global benefits due to actions that occur nationally.

\*\* The interagency group selected four sets of SCC values for use in regulatory analyses. Three sets of values are based on the average SCC from the integrated assessment models, at discount rates of 5 percent, 3 percent, and 2.5 percent. For example, for 2015 emissions, these values are $12.4/t, $40.6/t, and $63.2/t, in 2015$, respectively. The fourth set ($118/t in 2015$ for 2015 emissions); which represents the 95[th] percentile of the SCC distribution calculated using a 3-percent discount rate, is included to represent higher-than-expected impacts from temperature change further out in the tails of the SCC distribution. The SCC values are emission year specific. See section IV.L.1 for more details.

† DOE estimated the monetized value of $NO_X$ emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by EPA's Office of Air Quality Planning and Standards. (Available at www.epa.gov/cleanpowerplan/clean-power-plan-final-rule-regulatory-impact-analysis.) See section IV.L.2 for further discussion. To be conservative, DOE is primarily using a national benefit-per-ton estimate for $NO_X$ emitted from the Electricity Generating Unit sector based on an estimate of premature mortality derived from the ACS study (Krewski et al. 2009). If the benefit-per-ton estimates were based on the Six Cities study (Lepeule et al. 2011), the values would be nearly two-and-a-half times larger.

‡ Total Benefits for both the 3-percent and 7-percent cases are presented using only the average SCC with 3-percent discount rate.

Appendix B                 DOE Summaries of Economic Benefits and Costs

**Table I.3 Selected Categories of Economic Benefits and Costs of New Energy Conservation Standards for Portable Air Conditioners\* (TSL 2)**

| Category | Present Value billion 2015$ | Discount Rate Percent |
|---|---|---|
| **Benefits** | | |
| Consumer Operating Cost Savings | 1.8 | 7 |
| | 4.1 | 3 |
| GHG Reduction (using avg. social costs at 5% discount rate)\*\* | 0.2 | 5 |
| GHG Reduction (using avg. social costs at 3% discount rate)\*\* | 1.0 | 3 |
| GHG Reduction (using avg. social costs at 2.5% discount rate)\*\* | 1.5 | 2.5 |
| GHG Reduction (using 95th percentile social costs at 3% discount rate)\*\* | 2.9 | 3 |
| $NO_X$ Reduction † | 0.02 | 7 |
| | 0.06 | 3 |
| Total Benefits‡ | 2.8 | 7 |
| | 5.1 | 3 |
| **Costs** | | |
| Consumer Incremental Installed Costs | 0.5 | 7 |
| | 1.0 | 3 |
| **Total Net Benefits** | | |
| Including GHG and $NO_X$ Reduction Monetized Value‡ | 2.2 | 7 |
| | 4.1 | 3 |

\* This table presents the costs and benefits associated with portable ACs shipped in 2022−2051. These results include benefits to consumers which accrue after 2051 from the products shipped in 2022−2051. The incremental installed costs include incremental equipment cost as well as installation costs. The costs account for the incremental variable and fixed costs incurred by manufacturers due to the proposed standards, some of which may be incurred in preparation for the rule. The GHG reduction benefits are global benefits due to actions that occur domestically.

\*\* The interagency group selected four sets of SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ values for use in regulatory analyses. Three sets of values are based on the average social costs from the integrated assessment models, at discount rates of 5 percent, 3 percent, and 2.5 percent. The fourth set, which represents the 95th percentile of the SC-$CO_2$ distribution calculated using a 3-percent discount rate, is included to represent higher-than-expected impacts from climate change further out in the tails of the social cost distributions. The social cost values are emission year specific. See section IV.L.1 of this document for more details.

† DOE estimated the monetized value of $NO_X$ emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by EPA's Office of Air Quality Planning and Standards. (Available at www.epa.gov/cleanpowerplan/clean-power-plan-final-rule-regulatory-impact-analysis.) See section IV.L of this document for further discussion. DOE is primarily using a national benefit-per-ton estimate for $NO_X$ emitted from the electricity generating sector based on an estimate of premature mortality derived from the ACS study (Krewski et al. 2009). If the benefit-per-ton estimates were based on the Six Cities study (Lepeule et al. 2011), the values would be nearly two-and-a-half times larger.

‡ Total Benefits for both the 3-percent and 7-percent cases are presented using the average social costs with 3-percent discount rate.

Appendix B                 DOE Summaries of Economic Benefits and Costs

## Table I-3 Selected Categories of Economic Benefits and Costs of Adopted Energy Conservation Standards for the Considered WICF Refrigeration Systems (TSL 3)[*]

| Category | Present Value billion 2015$ | Discount Rate percent |
|---|---|---|
| **Benefits** | | |
| Consumer Operating Cost Savings | 1.7 | 7 |
| | 3.8 | 3 |
| GHG Reduction (using avg. social costs at 5% discount rate)[**] | 0.4 | 5 |
| GHG Reduction (using avg. social costs at 3% discount rate)[**] | 1.7 | 3 |
| GHG Reduction (using avg. social costs at 2.5% discount rate)[**] | 2.7 | 2.5 |
| GHG Reduction (using 95th percentile social costs at 3% discount rate)[**] | 5.1 | 3 |
| $NO_X$ Reduction[†] | 0.0 | 7 |
| | 0.1 | 3 |
| Total Benefits[‡] | 3.5 | 7 |
| | 5.6 | 3 |
| **Costs** | | |
| Consumer Incremental Installed Costs | 0.3 | 7 |
| | 0.6 | 3 |
| **Total Net Benefits** | | |
| Including GHG and $NO_X$ Reduction Monetized Value[‡] | 3.1 | 7 |
| | 5.0 | 3 |

\* This table presents the costs and benefits associated with considered WICF refrigeration systems shipped in 2020–2049. These results include benefits to consumers which accrue after 2049 from the products shipped in 2020–2049. The incremental installed costs include incremental equipment cost as well as installation costs. The costs account for the incremental variable and fixed costs incurred by manufacturers due to the adopted standards, some of which may be incurred in preparation for the rule. The GHG reduction benefits are global benefits due to actions that occur domestically.

\*\* The interagency group selected four sets of SC-CO₂, SC-CH₄, and SC-N₂O values for use in regulatory analyses. Three sets of values are based on the average social costs from the integrated assessment models, at discount rates of 5 percent, 3 percent, and 2.5 percent. The fourth set, which represents the 95th percentile of the social cost distributions calculated using a 3-percent discount rate, is included to represent higher-than-expected impacts from climate change further out in the tails of the social cost distributions. The social cost values are emission year specific. See section IV.L.1 for more details.

† DOE estimated the monetized value of $NO_X$ emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by

EPA's Office of Air Quality Planning and Standards. (Available at www.epa.gov/cleanpowerplan/clean-power-plan-final-rule-regulatory-impact-analysis.) See section IV.M.3 for further discussion. To be conservative, DOE is primarily using a national benefit-per-ton estimate for $NO_X$ emitted from the electricity generation sector based on an estimate of premature mortality derived from the ACS study (Krewski et al. 2009). If the benefit-per-ton estimates were based on the Six Cities study (Lepeule et al. 2011), the values would be nearly two-and-a-half times larger.

‡ Total Benefits for both the 3-percent and 7-percent cases are presented using the average social costs with 3-percent discount rate.

Appendix B                    DOE Summaries of Economic Benefits and Costs

## Table I-3 Selected Categories of Economic Benefits and Costs of Adopted Energy Conservation Standards for UPSs[*]

| Category | Present Value billion 2015$ | Discount Rate percent |
|---|---|---|
| **Benefits** | | |
| Consumer Operating Cost Savings | 2.8 | 7 |
| | 5.6 | 3 |
| $CO_2$ Reduction (using avg. SC-$CO_2$ at 5% discount rate)[**] | 0.37 | 5 |
| $CO_2$ Reduction (using avg. SC-$CO_2$ at 3% discount rate)[**] | 1.7 | 3 |
| $CO_2$ Reduction (using avg. SC-$CO_2$ at 2.5% discount rate)[**] | 2.6 | 2.5 |
| $CO_2$ Reduction (using 95th percentile SC-$CO_2$ at 3% discount rate)[**] | 5.0 | 3 |
| $NO_X$ Reduction [†] | 0.06 | 7 |
| | 0.12 | 3 |
| Total Benefits[‡] | 4.5 | 7 |
| | 7.3 | 3 |
| **Costs** | | |
| Consumer Incremental Installed Costs | 1.4 | 7 |
| | 2.6 | 3 |
| **Total Net Benefits** | | |
| Including $CO_2$ and $NO_X$ Reduction Monetized Value[‡] | 3.1 | 7 |
| | 4.8 | 3 |

* This table presents the costs and benefits associated with UPSs shipped in 2019–2048. These results include benefits to consumers which accrue after 2048 from the products purchased in 2019–2048. The incremental installed costs include incremental equipment cost as well as installation costs. The costs account for the incremental variable and fixed costs incurred by manufacturers due to the proposed standards, some of which may be incurred in preparation for the rule. The $CO_2$ reduction benefits are global benefits due to actions that occur domestically.

** The interagency group selected four sets of SC-$CO_2$ values for use in regulatory analyses. Three sets of values are based on the average SC-$CO_2$ from the integrated assessment models, at discount rates of 5 percent, 3 percent, and 2.5 percent. For example, for 2020 emissions, these values are $13.5/t, $47.4/t, and $69.9/t, in 2015$, respectively. The fourth set ($139/t in 2015$ for 2015 emissions), which represents the 95[th] percentile of the SC-$CO_2$ distribution calculated using a 3-percent discount rate, is included to represent higher-than-expected impacts from climate change further out in the tails of the SC-$CO_2$ distribution. The SC-$CO_2$ values are emission year specific. See section IV.L.1 for more details.

† DOE estimated the monetized value of $NO_X$ emissions reductions associated with electricity savings using benefit per ton estimates from the Regulatory Impact Analysis for the Clean Power Plan Final Rule, published in August 2015 by EPA's Office of Air Quality Planning and Standards. (Available at www.epa.gov/cleanpowerplan/clean-power-plan-final-rule-regulatory-impact-analysis.) See section IV.L.2 for further discussion. To be conservative, DOE is primarily using a national benefit-per-ton estimate for $NO_X$ emitted from the electricity generating sector based on an estimate of premature mortality derived from the ACS study (Krewski et al. 2009). If the benefit-per-ton estimates were based on the Six Cities study (Lepeule et al. 2011), the values would be nearly two-and-a-half times larger.

‡ Total Benefits for both the 3-percent and 7-percent cases are presented using the average SC-$CO_2$ with 3-percent discount rate.

Exhibit B

NATURAL RESOURCES DEFENSE COUNCIL

SIERRA CLUB

CONSUMER FEDERATION OF AMERICA

April 3, 2017

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Hon. James Richard Perry, Secretary
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

Re:     60-day notice of intent to sue for violations of the Energy Policy and
        Conservation Act

Dear Secretary Perry:

On behalf of the Natural Resources Defense Council, Sierra Club, and Consumer
Federation of America, we write to urge the Department of Energy to comply with its
duty to publish in the Federal Register five final rules prescribing energy conservation
standards under the Energy Policy and Conservation Act (EPCA). Each of the five
rules—which cover compressors, uninterruptible power supplies, walk-in coolers and
freezers, portable air conditioners, and commercial packaged boilers—is the product of
a robust rulemaking process and was signed by an authorized DOE official in
December 2016.[1] DOE regulations mandate that the Department now take the final step
required to ensure the rules' effectiveness: send them to the Office of the Federal
Register for publication.

---

[1] Energy Conservation Standards for Portable Air Conditioners, Docket No. EERE-2013-
BT-STD-0033 (posted Dec. 28, 2016); Energy Conservation Standards for Uninterruptible
Power Supplies, Docket No. EERE-2016-BT-STD-0022 (posted Dec. 28, 2016); Energy
Conservation Standards for Air Compressors, Docket No. EERE-2013-BT-STD-0040
(posted Dec. 5, 2016); Energy Conservation Standards for Walk-in Cooler and Freezer
Refrigeration Systems, Docket No. EERE-2015-BT-STD-0016 (posted Dec. 28, 2016);
Energy Conservation Standards for Commercial Packaged Boilers, Docket No. EERE-
2013-BT-STD-0030 (posted Dec. 28, 2016).

1

Energy efficiency is the most affordable and effective solution to America's energy problems. Appliance and equipment efficiency standards save energy, increase the reliability of the electricity grid, reduce consumer energy bills, and decrease pollution. DOE's energy efficiency standards program has been transformative in making U.S. buildings and products more efficient. The program has a long history of bipartisan support. President Reagan signed into law the provisions of EPCA that establish appliance efficiency standards, while Presidents George H.W. Bush and George W. Bush signed strengthening legislation.[2]

The five rules awaiting publication will provide important benefits to our organizations, our members, and the American public. According to DOE projections, the standards prescribed by the rules will save approximately 2.76 quads of energy—about 3 percent of all the energy used in the United States for all purposes in a year—over a 30-year period. These energy savings will save consumers money on their utility bills: combined, the standards will yield more than $11 billion in consumer net-present-value savings over 30 years of shipments. The standards will also reduce emissions of carbon dioxide by more than 25 million metric tons by 2030—equivalent to the emissions generated by the annual electricity use of more than 3 million U.S. homes. Additionally, the standards will enhance public health by reducing emissions of other harmful air pollutants, such as sulfur dioxide and nitrogen oxides, by hundreds of thousands of tons.

None of these benefits will accrue, however, unless DOE complies with its regulations and publishes the final rules in the Federal Register. We respectfully request that DOE immediately send the final rules to the Office of the Federal Register and ensure that they are published. If DOE fails to do so, we intend to commence litigation to enforce DOE's regulatory duty to publish the final rules.

DOE's Legal Obligations

At the conclusion of a rulemaking establishing or amending an energy conservation standard under EPCA, DOE is required by regulation to post the signed final rule on its website for a 45-day public inspection period. 10 C.F.R. § 430.5(c). The "posting of an energy conservation standards rule signals the end of DOE's substantive analysis and decision-making regarding the applicable standards." 81 Fed. Reg. 57,745, 57,751 (Aug.

---

[2] *See* Pub. L. 100-12; Pub. L. 100-357; Pub, L. 102-486; Pub. L. 109-58; Pub. L. 110-140.

24, 2016). During the 45-day period, any person may identify a potential error in the rule and request that DOE correct it. 10 C.F.R. § 430.5(d). DOE's regulations define an error as "an aspect of the regulatory text of a rule that is inconsistent with what [DOE] intended regarding the rule at the time of posting," for example, a "typographical," "calculation," or "numbering" mistake. *Id.* § 430.5(b).

The regulations mandate that DOE take one of three courses of action after the 45-day inspection period ends:

(1) If DOE receives a request for correction but decides not to make any corrections, DOE "will submit the rule for publication to the Office of the Federal Register as it was posted." *Id.* § 430.5(f)(1).

(2) If DOE receives no requests, the Department "will in due course submit the rule, as it was posted . . . , to the Office of the Federal Register for publication. This will occur after" the 45-day inspection period "has elapsed." *Id.* § 430.5(f)(2).

(3) If DOE receives a request and determines that a correction is necessary, the Department "will, absent extenuating circumstances, submit a corrected rule for publication in the Federal Register within 30 days" after the 45-day inspection period "has elapsed." *Id.* § 430.5(f)(3).

As required by these regulations, DOE posted the five signed, final rules on its website in December 2016. For the compressors rule, the 45-day inspection period ended on January 19, 2017. For the remaining four rules, the period ended on February 11, 2017. Based on information available in the rulemaking dockets, DOE received requests to correct alleged errors in the commercial packaged boiler rule, but received no correction requests for the other four rules.

It has been more than 30 days since the 45-day inspection period ended for all five rules, *see id.* § 430.5(f)(3), and DOE is now required to submit the five rules, as posted or as corrected, to the Office of the Federal Register for publication.

Conclusion

DOE's unlawful failure to send the five final rules to the Office of the Federal Register is unacceptable. The delay in the rules' publication could delay manufacturers' ultimate compliance with the standards, harming our organizations, our members, and American consumers. By failing to ensure the rules' publication in the Federal Register, DOE has failed to perform a nondiscretionary duty under its regulations implementing EPCA, and is therefore subject to suit under 42 U.S.C. § 6305(a) and § 6316, and/or the Administrative Procedure Act.

3

We respectfully request that DOE immediately send the five final rules to the Office of the Federal Register and ensure that they are published in the Federal Register. Although we hope that litigation will not be necessary, if DOE maintains its unlawful inaction, then we intend to commence litigation as early as 60 days from the date of this letter, to compel DOE comply with its nondiscretionary duty to publish the five rules. Accordingly, to the extent required by 42 U.S.C. § 6305(b)(2), we hereby provide notice of our intent to pursue such litigation. Other parties not signatories to this letter may also join this litigation with respect to the same claims covered by this letter.

Respectfully,

Aaron Colangelo
Jennifer A. Sorenson
*Counsel for Natural Resources*
*Defense Council*

Timothy Ballo
Earthjustice
*Counsel for Sierra Club and Consumer*
*Federation of America*

cc:     Federal Trade Commission
        600 Pennsylvania Ave., NW
        Washington, DC 20580