UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>JAMES R. PERRY, et al.,<br><br>        Defendants. | Case No. 17-cv-03404-VC<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 46, 48, 65, 67 |
| PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>JAMES R. PERRY, et al.,<br><br>       Defendants. | Case No. 17-cv-03406-VC |

In December 2016, the Department of Energy adopted four energy conservation standards. It posted the standards on its website so the public could review them for errors before publication in the Federal Register. A year has passed since the error-correction process ended. But the Department still has not published the energy standards in the Federal Register, which is preventing the standards from taking effect. This failure is a violation of the Department's duties under the Energy Policy and Conservation Act. Therefore, summary judgment is granted to the plaintiffs, and the Department is ordered to publish the standards.

**I**

Under the Energy Policy and Conservation Act, the Department of Energy has the power

to set energy standards for home appliances and industrial equipment. In December 2016, the Department posted four standards on its website. These standards are for portable air conditioners, air compressors, commercial packaged boilers, and uninterruptible power supplies. The Department has estimated that over a 30-year period these standards will result in 99 million metric tons of reduced carbon dioxide emissions and save consumers and businesses $8.4 billion. Dkt. No. 65-2 at ¶¶ 13-16.

Under the Department's "Error Correction Rule," the Department must give the public a 45-day window to review energy standards for errors before the Department submits them to the Office of the Federal Register for publication. 10 C.F.R. § 430.5(c). An error, as defined by the Error Correction Rule, is "an aspect of the regulatory text of a rule that is inconsistent with what the Secretary intended regarding the rule at the time of posting" on the Department's website. For example, an error could be a "typographical mistake," a "calculation mistake," or an incorrect cross-reference. *Id.* § 430.5(b). Thus, when the Department posted the four energy standards in December 2016, it stated that members of the public could email it with "any typographical or other errors, as described in such regulations, by no later than midnight on February 11, 2017 [or January 19, 2017, depending on the standard], in order that [the Department of Energy] may make any necessary corrections in the regulatory text submitted to the Office of the Federal Register for publication." Dkt. Nos. 66-1 at 2, 66-2 at 2, 66-3 at 2, and 66-4 at 2. In each posted document, the Department stated that the energy standard was a "final rule." Dkt. Nos. 66-1 at 2-3, 66-2 at 2-3, 66-3 at 2-3, and 66-4 at 2-3. On its website, the Department called the energy standards "pre-publication *Federal Register* final rule[s]." Dkt. Nos. 66-5 at 2, 66-7 at 2, and 66-8 at 2; *see also* Dkt. No. 66-6 at 3 ("pre-publication notice of final rule").

For three of the four standards, the Department did not receive any requests for correction. Dkt. No. 66-12 at 3. One error was identified in the fourth standard: a table included the value ">300,000" instead of "≥300,000." Dkt. Nos. 66-11 at 2, 66-12 at 3.

A year later, the Department still has not submitted any of the four energy standards to

the Office of the Federal Register for publication. There has been no explanation for this, other than a statement at oral argument by counsel that the Department is "still considering" the four energy standards. Dkt. No. 78 at 26:5. The plaintiffs, a group of environmental organizations and a group of states and state agencies, have brought suit to compel the Department to publish the standards.

II

The Department first argues that the citizen-suit provision of the Energy Policy and Conservation Act does not give citizens a means to sue the Department for failing to comply with a regulation adopted under the Act; instead, the Department argues the citizen-suit provision only provides citizens a means to sue for failing to comply with the Act itself. But the only plausible interpretation of the citizen-suit provision is that it covers both regulatory and statutory obligations. *Cf. In re DBSI, Inc.*, 869 F.3d 1004, 1013 (9th Cir. 2017) (explaining that a statute does not preserve sovereign immunity if no "plausible interpretation of a statute that would preserve immunity is available").

The citizen-suit provision states that a person may sue the Department for failing "to perform any act or duty under this part which is not discretionary." 42 U.S.C. § 6305(a)(2). A "duty" can be imposed by a regulation as well as a statute. And the term "under this part" makes clear that Congress did not intend to limit the citizen-suit provision to statutory duties. When Congress wanted to describe only statutory duties in Part B of the Energy Policy and Conservation Act, it used the prepositions "in" and "of." By contrast, when it was referring to regulatory duties, it used the preposition "under." For example, in section 6305(a)(1), the preceding subsection of the citizen-suit provision, the statute describes violations of "any provision of this part or any rule under this part." And section 6302(a)(5) describes "an applicable energy conservation standard established in or prescribed under this part."

Interpreting "under this part" to include regulatory duties authorized by Part B also comports with the normal understanding of "under" and the normal legal understanding of regulations. "Under" can mean both "[e]xtending or directly below" or "[c]ontrolled, managed,

3

or governed by." *Under*, Oxford Living Dictionary, North American English (last visited Feb. 14, 2018) [https://perma.cc/S2FV-866C]; *see also Under*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("subject to the authority, control, guidance, or instruction of," "within the group or designation of," and "in or into a position below or beneath something"). Regulations must be authorized by a statute; thus they are "governed by" the authorizing statute and are below, beneath, or under statutes in the hierarchy of legal authority.

## III

The Department also argues that the citizen-suit provision does not apply because the duty the Rule imposes on the Department to publish energy standards that have been posted under the Error Correction Rule must be considered discretionary, and the citizen-suit provision only authorizes lawsuits in federal district court for the failure to perform a nondiscretionary duty. If a citizen-suit provision only allows suit for violation of a nondiscretionary duty, "the nondiscretionary nature of the duty must be clear-cut – that is, readily ascertainable from the statute [or other legal authority] allegedly giving rise to the duty." *WildEarth Guardians v. McCarthy*, 772 F.3d 1179, 1182 (9th Cir. 2014).

## A

The text of the Error Correction Rule creates a clear-cut duty for the Department to publish an energy standard in the Federal Register at the end of the error-correction process. Whether or not an error is identified during the process, the text of the Rule makes clear that the Department must publish any standard that has gone through the process. It states the Department "will" submit the standard for publication in all scenarios: when it receives a request for error correction but declines to make the correction; when it receives a request for error correction and decides to make the correction; and when it receives no request for error correction at all. 10 C.F.R. § 430.5(f)(1)-(3).[1]

---

[1] The Error Correction Rule does not address the timeline for publication of a standard in the scenario where the Department receives no request for error correction but identifies an error on its own during the error-correction period. It makes sense that the drafters of the Rule would not have thought to include a timeline for that scenario, because when the Department posts final

During adoption of the Error Correction Rule, the Department confirmed that energy standards are automatically published after the error-correction process is complete. For example, it noted that section (f) "describes how the Department *will* eventually publish a final rule in the Federal Register." Energy Conservation Program: Establishment of Procedures for Requests for Correction of Errors in Rules, 81 Fed. Reg. 26,998, 27,002 (May 5, 2016) (emphasis added). And the Department stated: "The error correction rule *prescribes* a timeline under which [the Department of Energy] *will* submit a rule to the Office of the Federal Register for publication." Energy Conservation Program: Notice of Partial Grant and Partial Denial of Petitions to Amend the Error Correction Rule, 81 Fed. Reg. 57,745, 57,750 (Aug. 24, 2016) (emphasis added).

**B**

The Department also argues that the Error Correction Rule preserves the Department's "free-standing authority and discretion to continue to assess, modify, or withdraw draft rules that the agency has contemplated before those rules are published as final rules in the Federal Register." Dkt. No. 46 at 12. But there is no support for this assertion in the language of the Rule or the history of its adoption. To the contrary, once the Department has posted an energy standard for error correction and the time to submit requests for correction has passed, subsection (f) of the Rule gives the Department only two options: publish the standard as posted, or correct any errors in the standard and publish it as corrected. 10 C.F.R. § 430.5(f)(1)-(3). And the remaining provisions of the Rule are consistent with subsection (f). For example, the Rule defines the term "error" as "an aspect of the regulatory text of a rule that is inconsistent with what the Secretary intended regarding the rule at the time of posting." *Id.* § 430.5(b). In other

---

standards for error correction, the Department's work is done; the error-correction period is for the *public* to identify errors the Department may have missed. Therefore, contrary to the Department's argument, the fact that the Error Correction Rule does not impose a publication timeline for the scenario where nobody identifies an error but the Department catches one on its own during the process is not a basis for concluding that the Rule leaves the Department with discretion whether to publish a standard. Nor, in any event, has the Department argued that it has, for the standards involved here, identified any error on its own.

words, the Department has already made its policy decision. For this reason, the Rule explains, "disagreement with a policy choice that the Secretary has made will not, on its own, constitute a valid basis for a request under this section." *Id.* § 430.5(d)(2)(ii). All the Error Correction Rule allows is a process to ensure that the regulatory text reflects that policy; then the regulatory text is published in the Federal Register.

It also bears emphasis that the Error Correction Rule did not grant the Department authority to "assess" or "modify" or "withdraw" an energy standard; it granted the Department authority to "correct" a standard. *Id.* § 430.5(g) ("Until an energy conservation standard has been published in the Federal Register, the Secretary may correct such standard . . . ."). Correct means to "[f]ree from error." *Correct*, Oxford Living Dictionary, North American English (last visited Feb. 14, 2018) [https://perma.cc/BN8L-AGQA]; *see also Correct*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to make or set right"). "Correct," particularly in this context, does not connote a substantive alteration to a standard or withdrawal of a standard.

The regulatory history confirms this understanding. When the Department first published the Error Correction Rule, it specified that it only posts an energy standard for error correction "after concluding its deliberations and reaching decisions on the relevant factual determinations and policy choices." 81 Fed. Reg. 26,998, 26,999; *see also id.* at 27,000 (noting that "two common features" of errors are that the "regulatory text departs from what [the Department] intended it to be" and "the rulemaking record reveals what [the Department] intended"). And when it amended the Rule a few months later, the Department stated:

> In [the Department's] view, the posting of an energy conservation standards rule signals the end of [the Department's] substantive analysis and decision-making regarding the applicable standards. The purpose of the error correction rule is to ensure that the legal requirements that regulated entities will need to meet – as detailed in the regulatory text of a given standards rule – accurately reflect that completed substantive analysis and decision-making.

81 Fed. Reg. 57,745, 57,751. In fact, the Department rejected a request to expand the scope of the Error Correction Rule to include any broader assessment of the energy standard under review – including even a review of the standard's preamble and supporting materials for errors. The

Department reasoned that the cost of further delaying the energy standard's publication outweighed the benefit gained by revisiting "issues that have already been raised and addressed during the rulemaking process." *Id.* at 57,746. And the Department determined any benefit to further review was slight, because even if it did reconsider its policy decisions, the Department "would generally adhere to the policy decisions it has already made." *Id.* at 57,749.

## C

Notwithstanding all this, the Department argues that the Court should defer to the Department's current interpretation of the Error Correction Rule. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). But as discussed above, this interpretation is "plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). Moreover, the Department's arguments in its briefs contradict the Department's statements when it enacted and amended the Error Correction Rule. *Auer* deference does not apply if "it appears that the interpretation is nothing more than a convenient litigating position." *Vietnam Veterans of America v. CIA*, 811 F.3d 1068, 1078 (9th Cir. 2016) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)) (internal quotation marks omitted).

## IV

Finally, the Department argues that even if the Error Correction Rule requires publication of the standards, the duty remains "discretionary" as a matter of timing, thereby preventing the plaintiffs from invoking the citizen-suit provision. It's true that the Rule does not categorically require the Department to publish an energy standard by a specific date. For example, if the Department "receives no properly filed requests after posting a rule and identifies no Errors," the Department must submit the standard for publication "in due course." 10 C.F.R. § 430.5(f)(2). And although the Rule normally requires publication within 30 days if an error is identified and corrected, the Department can take longer if there are "extenuating circumstances." *Id.* § 430.5(f)(3). One such circumstance could be that an error requires more than 30 days to correct because it "relates to particularly complex engineering analysis." 81 Fed. Reg. 57,745, 57,750.

For the proposition that this lack of precision regarding timing renders the publication

duty "discretionary," the Department cites *Sierra Club v. Thomas*, in which the D.C. Circuit adopted a bright-line rule that whenever there is no clear requirement "that *all* specified action be taken by a date-certain deadline," a duty remains discretionary.  828 F.2d 783, 791 (D.C. Cir. 1987) (emphasis in original).  But that rule is too simplistic for the complex world of administrative agency decision-making, failing to account for the variety of different contexts in which agencies perform their duties.  In some contexts, the absence of a date-certain deadline may be explained by the need for the agency to exercise discretion about when the duty should be performed – perhaps, for example, because of the need to decide how to allocate limited resources.  *See Murray Energy Corp. v. Administrator of EPA*, 861 F.3d 529, 536 (4th Cir. 2017).  In other contexts, the absence of a date-certain deadline may be unrelated to any need for the agency to exercise discretion; the absence of the deadline may simply be because it does not matter whether the agency acts on a Tuesday or a Wednesday, so long as it does, in fact, fulfill the duty.  *Cf. Coos County Board of County Commissioners v. Kempthorne*, 531 F.3d 792, 803-05 (9th Cir. 2008) (assuming that a statutory duty to "promptly publish" a proposed regulation would be a nondiscretionary duty).

  Most courts have therefore taken a more pragmatic approach when assessing whether a duty or act is discretionary.  For example, courts have held that a duty is discretionary if it is "a broad, open-ended statutory mandate"; if the duty requires the agency to evaluate how to allocate its limited resources; if the duty is "conducted on a *continuing* basis"; or if the duty involves the exercise of the agency's technical expertise or specialized knowledge.  *Murray Energy Corp.*, 861 F.3d at 536 (emphasis in original); *see also Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978).  The Department's obligation to submit energy standards to the Office of the Federal Register following the error correction period is none of these things.  It is a discrete obligation triggered by a specific set of events that requires neither exercise of the Department's technical expertise nor decisions about how to allocate the Department's resources.

Thus, the duty is not discretionary.[2]

## V

This Court has jurisdiction to adjudicate whether the Department breached its duty under the Error Correction Rule to publish the four energy standards in the Federal Register; the Department has in fact breached that duty. Summary judgment is therefore granted to the plaintiffs on this claim, and the Department is ordered to publish the standards within 28 days of this ruling. Because this claim is dispositive, the Court does not address the plaintiffs' remaining claims. The motions to dismiss by the Department and by the intervening defendant, the Air-Conditioning, Heating, and Refrigeration Institute, are denied. Should the Department wish to appeal this ruling, the Court will entertain a motion for a stay pending appeal, which can be filed as an administrative motion pursuant to Local Rule 7-11.

**IT IS SO ORDERED.**

Dated: February 15, 2018

_____
VINCE CHHABRIA
United States District Judge

---

[2] As noted previously, the Rule provides that when the Department receives an error correction request and decides to correct the error, it must do so within 30 days "absent extenuating circumstances." 10 C.F.R. § 430.5(f)(3). Presumably, for the reasons discussed in this ruling, the Department's invocation of extenuating circumstances to delay a correction could convert the duty to publish the standard in the Federal Register into a discretionary one, at least in terms of the timing of publication. But in this case, the Department has disclaimed extenuating circumstances.